State v. May.

THE STATE v. MAY *et al., Appellants.*

Division Two, December 22, 1897.

1. **Practice:** COUNTING SUNDAY. Sunday is not counted in computing the time in which motions are to be filed in court or other steps taken therein of a similar nature in pending causes. The law does not require either lawyers or judges to work on Sunday.

2. **Criminal Practice:** COUNTING SUNDAY IN CHALLENGING JURORS. By the amendment of 1895 (Laws of 1895, p. 165) to section 4204, Revised Statutes 1889, requiring a list of jurors in a murder case to be delivered to the defendant at least twenty-four hours before the trial, Sunday is not to be counted in calculating the twenty-four hours.

3. ——: ——: CASE STATED. The list of jurors in a murder case was delivered to the defendant at 12 o'clock Saturday, and defendant was required to announce his challenges at 10:30 Monday. *Held* to be error.

4. ——: ATTACKING DEFENDANT'S CHARACTER. Defendants having offered themselves as witnesses, it was competent for the State to attack their general moral character. (BURGESS, J., dissenting.)

5. ——: VENUE. The State must prove in what county the mortal wound was inflicted, rather than in what county the murdered man died.

6. ——: MURDER IN SECOND DEGREE: REFUSED INSTRUCTION. The trial court committed error in refusing to give this instruction asked for by defendant: "If you find from the evidence that the defendant intentionally killed Burdette by hitting him over the head with the stick mentioned in evidence, and that such stick was a deadly weapon, then the law presumes that such killing was murder in the second degree in the absence of evidence to the contrary."

State v. May.

7. ———: EVIDENCE: CONSPIRACY. Where the theory of the State was that the defendants, uncle and nephew, had formed a conspiracy to murder one or more persons, and the evidence shows that the nephew did not reside in Missouri at the time the threats were made, such threats are wholly inadmissible as to such nephew.

8. ———: ———: CONSPIRACY TO FIGHT WITH FISTS. Where two persons conspire to fight another with their fists, and one resorts to the use of a deadly weapon without the other's knowledge or consent, the other could not be held responsible.

9. ———: CONSPIRACY: CASE STATED. The facts of this case are reviewed and it is held that they do not show any conspiracy between the defendants to commit the murder charged.

10. ———: INSTRUCTIONS FOR MURDER IN SECOND AND FIRST DEGREE. The evidence was conflicting as to whether the blow that killed the deceased was struck while he was lying prone on the ground, or while he was standing upright and reaching to his pocket for a pistol. Under this state of the evidence it is held that the court properly gave instructions that the defendant might be found guilty of a less grade of homicide than murder in the second degree; but the court also holds that if it be true that the deceased was struck on the head with the club while lying prone and helpless on the ground, this, owing to the inherent cruelty and barbarity of the act, might warrant an instruction and a verdict for murder in the first degree.

11. ———: ARRESTS BY JUSTICES. A justice of the peace has no authority to make arrests without a warrant, upon information derived from another.

12. ———: SUBSEQUENT ARREST: EVIDENCE: PREJUDICE. It is error to permit evidence concerning the arrest of defendants for a subsequent offense, and its only tendency being toward prejudicing the jury, the court ought to have excluded it of his own motion, although no objection was offered.

*Appeal from Buchanan County Criminal Court.*—HON. R. E. CULVER, Judge.

REVERSED IN PART; REVERSED AND REMANDED IN PART.

*Wilson & Watkins* and *Huston & Brewster* for appellants.

(1) The lower court erred in failing and refusing to instruct the jury on manslaughter in the second or

third degree as requested by the defendants.  *State v. Turlington*, 102 Mo. 642; *State v. Patrick*, 107 Mo. 147; *State v. Nelson*, 118 Mo. 124; *State v. Tallmadge*, 107 Mo. 543; *State v. Berkley*, 92 Mo. 54.   (2)   The lower court erred in refusing to instruct the jury to find the defendant, Charles May, not guilty.   *State v. Ballard*, 104 Mo. 634; *State v. Cox*, 65 Mo. 23; *State v. Hickman*, 95 Mo. 332; *State v. Johnson*, 111 Mo. 578; *State v. Orrick*, 106 Mo. 111.   (3)   The lower court erred in giving to the jury the instruction concerning murder in the second degree.   3 Greenl. on Ev. [13 Ed.], sec. 25; *Mahoney v. State*, 26 S. W. Rep. 622; *State v. Rainsberger*, 45 N. W. Rep. 302; *Adams v. People*, 9 Hun. 89; *State v. Nelson*, 98 Mo. 414.   (4)   The trial court erred in compelling defendants to announce their challenges within twenty-four hours after the list was delivered to them, excluding Sunday.   See Acts 1895, p. 165; R. S. 1889, secs. 3852 and 3855; *State v. Buckner*, 25 Mo. 167; *State v. Green*, 66 Mo. 644; *State v. Harris*, 121 Mo. 445.   (5)   The court erred in not instructing the jury that the threats purporting to have been made by George May long before Charles May ever lived in the State or knew any of the parties and long before it could be claimed that there was any pretense or opportunity for a common design could only be considered as against George May.   *State v. McKenzie*, 102 Mo. 620.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for the State.

(1)   No objection can be urged against the court's refusal to give instruction number 3.   This instruction is embodied in instruction number 1 of those given by the court.   *State v. Thomas*, 99 Mo. 335; *State v. Mathews*, 98 Mo. 123.   (2)   And so it is with all the other instruc-

tions offered by the defendants.    Every point necessary
for the jury to be instructed upon is included in those
given by the court.    An instruction is properly refused
if the same principle is contained in another given.
*State v. Jones*, 78 Mo. 285; *State v. Watson*, 74 Mo. 270;
*State v. Smith*, 80 Mo. 516; *State v. Baker*, 136 Mo. 74.
(3) A multiplicity of instructions should be avoided.
*State v. Arrell*, 97 Mo. 105; *State v. Reed*, 117 Mo. 604;
(4) The instructions given by the court express all
the law warranted by the evidence in an exceedingly
clear and lucid manner, and as they appear upon the
record are not susceptible of objection.    Such instruc-
tions have been frequently approved by this court.
*State v. Dunn*, 80 Mo. 681; *State v. Curtis*, 70 Mo. 594;
*State v. Hooper*, 71 Mo. 425; *State v. Fitzgerald*, 130
Mo. 491; *State v. Duestrow*, 137 Mo. 44. (5) The court
properly refused to instruct the jury on manslaughter
in the second and third degrees.    *State v. Douglas*, 81
Mo. 231.    (6) The instruction of the court on the
question of self-defense constitutes a correct exposition
of the law.    An apprehension of danger is not sufficient.
There must be a reasonable cause for such apprehen-
sion.    However, it is not necessary that the design or
immediate danger of its accomplishment should in fact
exist.    *State v. Bateswell*, 105 Mo. 609; 1 McClain's
Criminal Law, secs. 303–306.    (7) On the question of
an agreement, arrangement or understanding between
defendants to assault William I. Burdette or William
C. Burdette, or to do them great bodily harm, no error
was committed.    1 McClain's Criminal Law, sec. 195.
(8)    When the record fails to show that full twenty-
four hours was given defendant in which to make his
challenges he will be considered as having waived his
statutory privilege in the premises and can not after-
ward take advantage of such failure when he neglected

to demand it at the time.   *State v. Gilmore*, 95 Mo. 554; *State v. Nagel*, 136 Mo. 45.

SHERWOOD, J.—George and Charles May, respectively uncle and nephew, appeal to this court from their conviction of murder in the first degree.   William I. Burdette is the name of the person killed, and the indictment charges the homicide to have been done on the ninth day of February, 1896, with a heavy wooden club, and that with it the skull of William I. Burdette was broken and crushed by the defendants.

Touching the circumstances attendant on the tragedy, there is the usual conflict in the testimony. About two weeks prior to the ninth of February aforesaid, Charley May, as he was usually called, arrived at his uncle's house; he was a stranger in those parts. William I. Burdette had a son by the name of "Bill" Burdette, who was a prominent figure in this presently-to-be-disclosed drama of the countryside.   The elder Burdette and the elder May lived on adjoining farms and between them, as is frequently the case between rival nations occupying contiguous territory, there existed feelings less calculated to "raise a mortal to the skies" than to "drag an angel down."

Old man Burdette would not let George May set traps on his farm to catch skunks, and there was anticipatory trouble between them in case the elder Burdette compelled the elder May to work a certain piece of road.   It does not appear, however, that May ever was compelled to do such work.   But toward "Bill" Burdette the son George May entertained a special aversion, which in about October of the precedent year gave token of its existence by a fight occurring between the parties which, as May got the better of the combat, resulted in the defeated party causing the arrest of May, and in consequence of the latter being fined,

created a deficit in his exchequer to the amount of $17.50. This financial outcome by no means tended to soften George May's asperity of temper toward "Bill" Burdette and toward his father. This increased ascerbity of feeling in May's breast caused him to utter to several neighbors of his divers and sundry threats of a less or greater force against the persons and lives of the two Burdettes. It is in evidence that these threats occurred in the early and middle of October, in November, and also in December prior to the homicide, and prior to Charles May's advent at his uncle's residence. Of these threats a patient search of this record does not afford a trace or indication that the younger May knew anything.

Bill Burdette had formerly been a resident of Kansas, and while there placed a *pretium affectionis* on a set of harness ( *Vide,* 4 Cent. Dic. 4714; 5 Jacob, Law Dic. 281; also, *Jones v. Williams,* 139 Mo. *loc. cit.* 37; 39 S. W. Rep. 486); and in consequence of its informal appropriation, he was for a time forcibly secluded from ordinary social intercourse. On his release he returned to Missouri. But Charley May had also resided in Kansas and was in this respect his peer, and could add the *similiter* to Bill Burdette's unconventional method of acquiring property. Shortly after the expiration of Charley May's prison sentence he, too, returned to Missouri. These preliminaries are necessary to an understanding of the previous biographies of the chief persons mentioned in this record and of their relations to and toward each other. Having disposed of these prefatory matters, we proceed to relate those things which have a closer bearing on the issue joined in this case.

On the morning of Sunday, the ninth day of February, 1896, George May, his two little girls aged respectively thirteen and eleven years, and Charles

May, after suitably dressing themselves for the occasion, Charley May with his overcoat on, wended their way afoot to Sugar Creek church, a building about a mile or so from where they lived.  Wm. I. Burdette and family, consisting of his wife and three daughters in the spring wagon, drawn by a pair of mules, and two daughters, one married and one single, on horseback, also betook themselves to the house of God.  Claude Andrews also joined this cavalcade on its way to the objective point aforesaid, he being the attendant of one of Wm. I. Burdette's daughters.  Services being over, and a portion of the congregation still remaining in the church, some of them gathered around the two stoves. Among these, as "Bill" Burdette testifies, were George May and Charles May, as well as himself; that on this occasion George May pointed him out to Charley May (whom "Bill" Burdette did not then know) saying *"there he is,"* and Charley May thereupon nodded his head; and that George May also pointed out at the same time to Charley May the father of the witness, and that this was done while about a dozen persons were gathered about the stove, and while witness was within some seven or eight feet of George May.  No one else testifies to this designation of Bill Burdette by George May, although it would seem that others standing about the stove would of necessity have seen or heard it.

Pretty soon after this, George May, Charley and the little girls left for home, the road leading back to their home turning first west for about two hundred yards, and then turns south.  On the east side of this road there was a hedge fence and a cornfield, and on the west side of this hedge between it and the road was a bank five or six feet high, and on this ran a path.  At the corner where the road turns south there is a gate leading into Elliott's field.  Into this gate

defendants and the little girls turned as they proceeded south. Very soon, however, Charley May and the two little girls got through the hedge, which it was easy to do, and walked in the path along the top of the bank. How soon George May got through the hedge and walked in the path does not clearly appear. Meanwhile Bill Burdette, who left the church a little after the Mays did, rode on his horse in the same direction in which they had gone. He overtook them soon after he had turned the corner, where the road, after proceeding west some two hundred yards, turns south. At this juncture he says he saw Charley May and the little girls just getting through the hedge and walking on top of the bank, about twenty-five yards from the corner; he says he did not see George then. Upon riding nearly opposite to them, he says Charley stopped, and said, "Hello, Wild Bill, never won a fight and never will." Bill says he asked him what he knew about it, and he said: " 'Here's one you can't whip, you God damn son of a bitch,' and I told him I didn't know him and didn't want any trouble, and George May says, 'Catch him, God damn him, and kill him.' " That witness saw George May just before he spoke the words just quoted; that he was on the inside of the cornfield, coming up in a kind of a run; that immediately that George May uttered these words, Charley May jumped down the bank, there some three or four feet high; jumped off the bank into the road, pulled him off his horse, thumped him around and stuck a knife into him; that he did not see George May get clear through the hedge, but saw him with a club, and that was the last thing before Charley May knocked him down again, etc.

A somewhat different version of this story is told by the little daughters of George May, who testified that after walking a short distance in the cornfield, they

got through the hedge with Charley's assistance, and walked along on the top of the bank, leaving their father walking inside of the cornfield; that shortly thereafter Bill Burdette came riding in view and when he came up riding in the road near them, Charley May said: "Wild Bill never fought and never will;" that to this Bill Burdette replied: "What is that to you, you God damn son of a bitch;" that Charley May then said: "Christ, Bill, I would't take that off my daddy," and immediately ran down the bank and toward him; that as he did so, Bill Burdette threw an apple at him; that thereupon Charley dashed forward, seized hold of Bill Burdette's overcoat; that the overcoat tore, threw Charley May to his knees, and Bill Burdette jumped off his horse onto him; that Charley turned Bill over and got onto him, and they got down fighting on the east side of the road next to the bank in a sort of ditch or depressed place; that Wm. I. Burdette very soon after this drove up to the scene of the action in a spring wagon, which also contained his wife and three daughters, about opposite to where the fight was in progress, stopped in the middle of the road, jumped out of the wagon, took a whip in his hands and went down to where Charley May and Bill Burdette were fighting on the east side of the road; that on this their father, who up to that time was over in the cornfield, came over the hedge fence, picked up a club off the side of the bank, when Wm. I. Burdette said: "Don't you come down here," while some of those in the spring wagon cried out: "Kill the son of a bitch, pa, kill him." That their father then went down the bank toward Wm. I. Burdette, who then hit their father with the butt end of his buggy whip on his right thumb, as he threw up his right hand as if to ward off the blow ; that old man Burdette struck their father twice with the whip as hard as he could,

and then their father struck old man Burdette with the club; that old man Burdette fell to his knees, got up again, put his hand back toward his pants pocket, backed off toward the west side of the road, and had just gotten to the right or west side of the mules hitched to the spring wagon, when their father hit old man Burdette again on the side of the head, and he fell, and that their father only struck old man Burdette *twice.* Meanwhile, they say that Charley May and Bill Burdette were down on the east side of the road fighting; that their father started on home and said to Charley, "Come on, Charley, that will do," when Charley got up off Bill, and Bill picked up the buggy whip and hit Charley with it, and Charley turned and stabbed him with the knife.

Behind the parties in the spring wagon, as it advanced on south, there rode on horseback the same parties that went with them to church, to wit, Claude Andrews, Mrs. Ida Elliott and a single daughter of Wm. I. Burdette, and behind rode Mr. Coleman, also on horseback. Claude Andrews, a State's witness, testifies that he was just behind the spring wagon, and when the mules stopped and old man Burdette got out with his whip and went round in front of his mules to assist his son, he, witness, ran ahead and had seized hold of Charley May before George May and old man Burdette met in front of the mules and had their encounter there. He also states that George May struck old man Burdette *four* times with the club, the last time when he was prone on the ground.

The testimony of James Coleman forms a pleasing contrast with that of some other witnesses for the State. He was disinterested and evidently a cool observer of what occurred. He testifies that when old man Burdette left the church and started home in the spring wagon with his family, witness was riding about one

hundred yards behind; that as he approached the top of the turn he looked down the road and saw Bill Burdette on in front on horseback, old man Burdette and his family in the spring wagon, and the person on horseback in front of witness, that is Andrews, and the two daughters of Burdette, who were riding (with him); that he also saw George May and Charley May; that at this time they were walking along side by side on top of the bank outside of the hedge; that his attention was momentarily attracted by a little dog which was worrying his horse, and when he looked up again it was just in time to see Charley May pass out into the road, and he ran to Bill Burdette's horse with his hands outstretched, then he twisted to the left a little, and Bill Burdette came off the horse; that Charley May had hold of him, then witness knew it was a fight for the first time.   Then Charley May picked Bill Burdette up and put him in the ditch on the east side of the road. Those in front of witness had stopped, thus compelling him to do the same, and the fight occurred about thirty yards in front of witness, who states that about this time Bill Burdette got up and Charley put him back down into the ditch.   Coleman, after stating these things, says:   "The old man (Burdette) jumped out of the wagon on the west side and he passed in front of the team and I could not see what had become of him. During all this time George May had stood up on this bank from where Charley left.   He started down into the road and as he come he picked up a piece of rail. They met in front of the team where I could not see them and I don't know what happened. Then I looked around to see if there was anybody in sight to help stop it. There was nobody but Johnny Elliott, and when I looked back the old man had backed out into view on the west side of the road with George May close to

him facing him; George hit him and knocked him nearly down.'' Coleman says that the old man then straightened up straight; he made a staggering step, holding his hands up (not having anything in them that witness saw), when George May hit him the second time and on the head, when old man Burdette sank to the ground and fell over. That George May then passed back out of his view in front of the team of mules; that after George May went out of witness' vision, the fight between Charley May and Bill Burdette seemed to cease, and they got up so witness could see the tops of their heads; then another little scuffle occurred between Charley May and Bill Burdette when the latter seemed to sink against the bank, and Charley May then went toward George May and they passed on down the road. Coleman also states that when the fight began he saw May's little girls standing on the bank. This witness' testimony seems to go counter to the theory of the State in one respect, which appears to be that George May, although it was muddy, remained walking in the cornfield for the purpose of concealment, and no other witness appears to corroborate the testimony of Bill Burdette as to George May's exclamation to Charley May, to ''catch and kill'' Bill Burdette.

Mrs. Burdette, who was in the spring wagon, in testifying states that she saw the fight between Charley May and Bill Burdette and that it occurred thirty or forty yards in advance of the spring wagon as it moved down south; that she saw Charley May pull Bill Burdette off his horse and shove him into the ditch when Bill Burdette raised up on his elbow. The spring wagon having approached very close to the parties, Mrs. Burdette says she told her husband to get out and back her son up or else Charley May would kill him. Her husband, thus instigated, when the mules stopped,

State v. May.

got out of the spring wagon with a buggy whip in his hand, on the west side of the mules, and went in front of them, and George May met him and struck him with a club; that on being struck her husband fell down right close to the team; that she only saw George May strike her husband *twice* and that after this second lick, she began begging George May for mercy; and witness further states that though she had seen George May walking in the cornfield, she had not seen him any more until she saw him coming with a club and meeting her husband as he went around the heads of the mules.    Other witnesses for the State assert that but *two* blows were struck by George May with the club, while they also say that the last lick was struck when old man Burdette *lay flat on the ground*.    Mrs. Ida Elliott confirms the statement of her mother that George May only struck her father *twice;* but she also says that her father, when struck the last time, was *motionless* on the ground, and that this last blow was struck after her mother had begged for mercy, differing, on this point, with her mother, and this witness says that *before* George May got through the hedge her father had gotten off the spring wagon and started toward her brother.    The large majority of the witnesses undoubtedly agree in this that George May picked up the club or piece of rail on the top of the bank after he got through the hedge and after old man Burdette had gotten out of the wagon, reached the head of the mules and started toward his son.

George May, testifying in his own behalf, confirms the preceding statement; and he confirms the statement of his little girls that old man Burdette had reached Charley and was hitting him over the head with the butt end of the whip before he got over the hedge, seized the club and hit old man Burdette over the head with it.    He also testifies that he never struck

him but *twice* and that although he fell to his hands and knees when first struck, yet that he straightened up straight and put his hand back to his pants pocket before he struck him the second or last lick.   That old man Burdette did so straighten up before being struck the last time is confirmed by the testimony of James Coleman.   George May also testifies that when he sprang over the hedge and picked up the rail, old man Burdette said: "Don't you come down here," and that thereupon he stepped down and told old man Burdette, "Don't you hit him any more," and that then old man Burdette struck him twice on the thumb with the butt end of the whip, and then George May says he struck him for the first time, and did not strike him the second time until after the old man had straightened up and reached back with his right hand toward his pants pocket, and that then the old man was standing on the west side of the mules, and that at the second lick the piece of rail broke into three pieces, and the old man fell flat to the ground, and that when he was struck on the thumb with the whip, he had both hands raised up to ward off the licks.

Charley May, in testifying, says that when he was on top of Bill Burdette "pounding him in the head," that old man Burdette hit him across the head with the whip and that he, witness, did not see any of the fight between George May and old man Burdette.   The foregoing is regarded as a sufficiently substantial statement of the facts in this case in order to properly understand it, and the rulings made by the lower court.

Before going into a discussion of the merits of this case, it is necessary to notice the ruling made touching the panel of jurors.   The bill of exceptions contains this recital:   "A list of said jurors was delivered to the defendants at 12 o'clock noon on Saturday, the twenty-first day of November, 1896, and the court

thereupon adjourned until Monday morning, November 23, 1896, at 9:30 A. M., and afterward, to wit, on the said Monday, the twenty-third day of November, 1896, the court convened pursuant to said adjournment. And at the hour of 10:30 A. M. of said twenty-third day of November, 1896, the court, over the objection of the defendants, required defendants herein to announce their challenges to the jury.   The defendants thereupon objected to announcing their challenges to the jury at that time, for the reason that they had not been allowed twenty-four hours within which to make their said challenges exclusive of Sunday, which had intervened after the said list of jurors had been presented to them, which objection of defendants the court overruled and required defendants to announce their said challenges at the hour of 10:30 A. M. on said twenty-third day of November, 1896; to which action, ruling and judgment of the court the defendants at the time excepted."

1.   As Sunday is *dies non* as to judicial proceedings, it is not counted in computing the time in which motions are to be filed in court or other steps taken therein of a similar nature in pending causes.   This was the rule at common law and still remains unchanged by our statute.   Twenty-four *working hours* are what the statute means; and it does not require either lawyers or judges to work on Sunday.   *Bank v. Williams*, 46 Mo. 17; *Cattell v. Pub. Co.*, 88 Mo. 356; *State v. Harris*, 121 Mo. 445; *Maloney v. Railroad*, 122 Mo. 106. The recital shows that the list was delivered at a certain time to defendant and it will be presumed this was done on request; and if so, defendants can not be presumed to have waived, but on the contrary to have insisted on, their privileges, and this is shown also by their exception saved to the ruling mentioned.

Apart from this view it is important to note the provisions of our statute on this point:

Section 4204 of the laws of 1895, page 165, is as follows: "A list of jurors who have been found by the court to be qualified to sit as such in his case shall be delivered to the defendant, in the cases specified in the first subdivision of section 4200, at least twenty-four hours before the trial, and in the cases specified in the second subdivision of said section, at least twelve hours before the trial; and in other cases, before the jury is sworn, if such list be required." This section is a transcript of section 4204, Revised Statutes 1889, except that it changes forty-eight hours to twenty-four, and except, also, that it changes the punctuation in that section in this way:

That for a comma in the original section after the second occurrence of the word trial, is substituted a semicolon. This I understand from an eminent punctuator, causes the word "required" to refer only to "other cases," where a list may be demanded before a jury is sworn, leaving the party entitled thereto to an *absolute* right to the length of time specified in the statute, subject, of course, to an act on his part of unmistakable waiver. The Secretary of State informs us that the punctuation is the same on the original bill as found in the printed laws of 1895. From this it seems evident that the legislature intended something by the change made in the punctuation, and that their meaning was that already indicated.

The lower court consequently erred in ruling as it did.

2. The defendants, having offered themselves as witnesses, it was competent under our rulings to attack their general moral character. *State v. Grant*, 79 Mo. 113, and cases cited; but it rather seems that the prosecutor did not seem to definitely establish much in

the way of bad character as to George May except that he was regarded as a "scrapper" or fighter, as occasion might require.

3. The State proved in what county Wm. I. Burdette *died*, but not in what county the *mortal wound occurred*.

4. Error was committed in refusing to give the first instruction asked by defendants, which was the following:

"If you find from the evidence that the defendant George May intentionally killed William I. Burdette by hitting him over the head with the stick mentioned in evidence, and that such stick was a deadly weapon, then the law presumes that such killing was murder in the second degree in the absence of evidence to the contrary."

The doctrine embodied in this instruction is well settled law in this State, and has been for a long period. *State v. Tabor*, 95 Mo. *loc. cit.* 595, and cases cited. The trial court, it is true, instructed as to the elements of murder in the second degree, but the particular feature presented in the refused instruction was not given.

5. The threats which the evidence tended to show that George May uttered with regard to the Burdettes was obviously inadmissible as to Charles May, and this for several reasons. The theory of the State was a conspiracy to effect the death of one or more of the Burdettes; but at the time these threats are alleged to have been made, Charles May did not reside in Missouri, and there was no conspiracy in existence, unless indeed George could be said to have conspired with *himself;* a circumstance quite unusual.

Where a person joins a conspiracy already existent, he thereby ratifies any acts done or threats previously made by the conspirators in furtherance of the

common design; but in order to fasten the guilt of such antecedent acts or threats on such newly-joined conspirator, it is a *sine qua non* to establish that the conspiracy was *afoot* when the acts were done or the threats made.    3 Greenl. Ev. [14 Ed.], sec. 94; 1 *Ib.*, sec. 111; 1 Bishop, New Crim. Proc., sec. 1248; *Baker v. State*, 50 N. W. Rep. 518; *Williams v. Dickenson*, 9 So. Rep. 847.    As there was no such evidence as to Charley May the third instruction was erroneous both as to him and to George May.    And as to any threats made by George May, the jury should have been instructed to limit their operation alone to George May. *State v. McKinzie*, 102 Mo. 620.

6.    This brings us to the consideration of the third instruction from another point of view and in a different aspect.    Did the words of Bill Burdette as to what he said occurred in the church amount to any evidence of a conspiracy to effect the great bodily harm or death of either of the Burdettes?    We are not of opinion that it did, for it would be going a great way to hold that such mere words and designation of a person would amount to evidence of an agreement to effect either of the guilty purposes before mentioned; the doctrine of chances or of preponderating probabilities does not apply to a case like this where human lives are at stake. Even if it be granted that those spoken words were evidence of a conspiracy to kill either or both of the Burdettes, there is no evidence of a preparation to effect such design; no arms were carried by the so-called conspirators; Charles May only had a pocket knife, and George only had a club which he picked up on the spur of the moment after old man Burdette had jumped from the spring wagon and was advancing on Charley May, or else had reached and struck him twice over the head with the butt end of the whip.

But suppose (for we can only suppose) that the

evidence mentioned amounted to proof of conspiracy between George and Charles May to beat the Burdettes with their fists, and that George May, acting independently of such agreement, struck and killed old man Burdette; for this Charles May could not be held responsible.   This point has been expressly adjudged.  Bishop says:  "Where two combine to fight a third with fists, if death accidentally results from a blow inflicted by one, the other also is answerable for the homicide. But if the one resorts to a deadly weapon without the other's knowledge or consent, he only is thus liable." 1 Bishop, New Criminal Law, sec. 637, and cases cited.

Now the evidence shows very clearly that the combat between George May and old man Burdette was an entirely different and independent affair from that in which Charley May was engaged, and of the former of which Charley knew nothing.  Nor do we think the result is at all affected by the alleged exclamation of George May to Charles May, to "catch him and kill him," as such words might naturally spring from the excitement of the occasion; and beside, George May's exclamations could have no effect to establish an agreement between George May and Charley May to effect an unlawful purpose, unless a prior and existing conspiracy had been shown to exist between them, which has not been done.   For these reasons we are of opinion that an instruction should have been given as asked, instructing the jury to find Charley May not guilty.

7.   Recognition was properly given in the instructions to the fact that defendants might be found guilty of a less grade of homicide than murder in the second degree.

8.   But notwithstanding what is above said, it is proper also to say that if it be true that George May, after old man Burdette was lying prone and helpless on the ground, struck him on the head with the club, this,

owing to the inherent cruelty and barbarity of the act, might perhaps warrant an instruction as well as a verdict for murder in the first degree.    *State v. Kloss*, 117 Mo. 591, and cases cited; 1 Whart. Crim. Law [9 Ed.], sec. 475.

9.    Evidence was introduced without objection by defendants' then counsel, that one Horn, a justice of the peace, arming himself with a pistol and without warrant and upon information derived from another, proceeded to George May's house and arrested the defendants who objected to the same and offered some resistance thereto, since they questioned the squire's authority to make the arrest.    The justice had no authority to make such arrest.    Kelley's Crim. Law, sec. 59; R. S. 1889, sec. 4333.

But if he had, such evidence was in regard to another distinct and subsequent offense which had no connection with and could shed no light upon the previous homicide.    Its only tendency was to prejudice the jury against the defendants and to confuse them in regard to the real issues and evidence in the cause. *State v. Jackson*, 95 Mo. *loc. cit.* 649, and cases cited; *State v. Farris*, 129 Ill. 521.

The court, therefore, *of its own motion* should have refused to admit such wholly irrelevant evidence.    It becomes at times the duty of a court to take such a course, although, if no objection be taken at the time to the admission of such evidence, no advantage can be taken in an appellate court of such failure of the trial court to act.

The premises considered, we reverse the judgment as to Charles May, and order his discharge.    The judgment as to George May is also reversed, and the cause as to him remanded.    All concur, except Burgess, J., does not concur in paragraph 2.