THE STATE v. FRED SCOTT, Appellant.—58 S. W. (2d) 275.

Division Two, March 3, 1933.

*McKay & Peal* for appellant.

*Stratton Shartel*, Attorney-General, and *Silas E. Garner*, Special Assistant Attorney-General, for respondent.

ELLISON, P. J.—The appellant and three other defendants (as we shall call them) were jointly charged by information with attempting to rob one Mitt Robinson in New Madrid County. They disqualified the regular judge of the circuit under Section 3648, Revised Statutes 1929, and then obtained a change of venue to Pemiscot County in the same circuit on account of alleged prejudice of the inhabitants of New Madrid County. A severance was then taken. The appellant was tried three times. Twice the jury failed to agree. At the third trial he was convicted and his punishment assessed at two years' imprisonment in the penitentiary.

The evidence for the State was that about six o'clock in the evening of December 29, 1929, four men, or "high-jackers" as one witness called them, came to a small room at the rear of a restaurant in Marston owned by the prosecuting witness, Mitt Robinson, where a crap game was in progress. They had handkerchiefs tied over the lower part of their faces and their hat brims were pulled down. One of them said "Stick 'um up." Robinson was standing at the crap table on which was some $16 or $17 in silver money. He picked it up and put it in his pocket. One of the four robbers, a tall man, had a pistol and fired three shots. The third shot struck Robinson in the chest and he fell. The robbers then fled. Robinson was unable to identify any of them, except to say two of them were about the same size as the appellant and another of the defendants.

Five men were in the room at the time of the attempted holdup. One of these, Charles O'Bannon, said he had entered the restaurant just a few minutes before. As he passed up the street he saw the appellant standing on the sidewalk near the bank corner with another of the four defendants. They were close to a Ford sedan, the engine of which was running. The other two defendants also were there, one of them sitting in the car. O'Bannon testified that when the robbers came into the room where the crap game was in progress two of them had revolvers, fired and fled. He swore he was standing leaning against the door frame; that one of the two robbers was within eighteen inches of him; and that he recognized the man as Fred Scott, the appellant. He further said he left the scene of the shooting immediately and when he got out on the street the Ford sedan and the four men he had seen by it just a few minutes before, were gone. He was subjected to a lengthy cross-examination which retraced his testimony in previous trials. The sum total of this was that he was

able to recognize the appellant, notwithstanding his mask, by his clothes, size, nose, hair and some freckles, pimples or pock marks on the back of his neck and cheeks.

O'Bannon further testified he had seen the four defendants that day twice before, though he did not know their names; once about 4:30 in the afternoon as they were going north along the highway, and another time that morning. Jesse McAnally, a constable in New Madrid County, said he saw them on the highway about three miles north of Marston close to four o'clock in the afternoon. Harry Friend, who had known the defendants ten or fifteen years, testified he saw them in Marston about eleven o'clock in the morning on the day of the attempted robbery. That evening at dusk or dark he saw three of them, including the appellant, near a Ford car parked at the bank corner, with engine running. One of the defendants was in the car. When he passed that way a few minutes later they and the car were gone. All this closely corroborated the testimony of O'Bannon, summarized above.

The foregoing was the State's case in chief. The appellant's defense was an alibi. He did not deny the shooting and attempted robbery had occurred. On the contrary he used as witnesses two of the participants in the crap game, Buster Conners and Marvin Simmons, who agreed substantially with the story told by the State's witnesses except that they said they were unable to identify the robbers because of the handkerchiefs tied well up over their faces. There were also some small discrepancies as to whether the appellant wore a hat or cap, and as to the position of the State's witness O'Bannon in the room at the time of the shooting. Both these defense witnesses admitted, however, that one of the robbers was about the size of the appellant.

On the alibi, the appellant's brother-in-law, sister and mother testified he slept at home in Caruthersville, thirty miles from Marston, the Saturday night before the attempted robbery, got up about noon Sunday, ate dinner, and was gone during the afternoon. The family had supper that evening a few minutes after six. Before all had finished the meal the appellant came in and ate. After that he went with them to a picture show. One witness, Paul Disbennett, said he saw the appellant up town in Caruthersville about 5:30 or 6 P. M. the evening of the shooting and the two walked home together. This witness admitted he had never testified at any of the previous trials of the case. R. E. Lonon, a brother of Tromo Lonon, one of the four defendants, testified his brother had never owned a green Ford car but did have a dark blue one—the State's evidence had been that the car in or with which the four defendants had been seen during the day was a green Ford sedan owned by Tromo Lonon.

The appellant's direct examination was practically limited to a denial of participation in the attempted robbery. He said he had never made an assault on or attempted to rob the prosecuting witness Mitt Robinson and had never been present when any one else did, either on December 29, 1929, or at any other time. On cross-examination he said he was not at the scene of the shooting or in Marston on the day of the robbery.

For the State, in rebuttal four witnesses were produced who swore the general reputation of the appellant for morality in the community where he resided at and prior to the date of the attempted robbery was bad. Other facts will be noted as necessary in the course of the opinion.

■ ■ I. It is assigned that the information is fatally defective. No complaint on this ground was made before the trial but the point is raised in the motion for new trial. The information was in two counts, the first charging assault with intent to kill and the second attempted robbery. The first count was abandoned and the cause tried on the second count. It is as follows:

"And J. Val Baker, the prosecuting attorney aforesaid, upon his oath aforesaid, further informs the court, that on the 29th day of December, 1929, at the county of New Madrid, State of Missouri, Charles Birthwright, Joe Buchanan, Fred Scott and Tromle Lonon, did unlawfully, wilfully and feloniously attempt to rob one Mitt Robinson and did then and there unlawfully, wilfully and feloniously make an assault on said Mitt Robinson, the same being an offense prohibited by law, and in said attempt and towards the commission of said offense, they the said Charles Birthwright, Joe Buchanan, Fred Scott and Tromle Lonon, certain money, silver and currency and other personal property of said Mitt Robinson which he then and there had and possessed, they, the said Charles Birthwright, Joe Buchanan, Fred Scott and Tromle Lonon, from the person and against the will of said Mitt Robinson, then and there by force and violence to the person of said Mitt Robinson, feloniously did attempt to rob, steal, take and carry away; but that they, the said Charles Birthwright, Joe Buchanan, Fred Scott, and Tromle Lonon, did then and there fail in the perpetration of said offense, crime and felony, aforesaid, against the peace and dignity of the State."

Appellant contends the information wholly fails to charge any offense known to the law; that it is vague and indefinite; contains no allegation that the defendants attempted to rob with intent to deprive Mitt Robinson of his money and property permanently or to convert the same to their own use; and does not specify how or with what intent the alleged assault was made. It is also assigned that the "other property" referred to in the information is not described.

As will be seen, the information does allege the defendants feloniously attempted to rob Mitt Robinson and in said attempt and toward the commission thereof, by force and violence to his person tried to rob, steal, take and carry away from his person and against his will certain money, silver and currency which he then and there had and possessed. It is further charged that they failed in the attempt. We think this was sufficient.

Section 4058, Revised Statutes 1929, the first degree robbery statute, provides: "Every person who shall be convicted of feloniously taking the property of another from his person, or in his presence, and against his will, by violence to his person . . . shall be adjudged guilty of robbery in the first degree." The information follows the language of this statute in charging the crime attempted to be perpetrated. A robbery charge so made would be good. [State v. Hahn, 316 Mo. 229, 289 S. W. 845.] It was unnecessary to allege a felonious intent on the part of the defendants to convert the money to their own use and to deprive the owner thereof. [State v. Huffman, 238 S. W. 430, 435; State v. Lasson, 292 Mo. 155, 171, 238 S. W. 101, 105.]

Complaint is made that the "other property" referred to in the information was not described. This is immaterial for the reason that there was no proof of the attempted taking of any property other than money. As to the money, the description in the information "certain money, silver and currency" was sufficient, though no amount or value was specified. The first degree robbery statute, Section 4058, Revised Statutes 1929, fixes no minimum in this regard; and Section 3559, Revised Statutes 1929, says:

"In every indictment in which it shall be necessary to make any averment as to any money or note . . . it shall be sufficient to describe such money or note simply as money, without specifying any particular coin or note; and such allegation shall be sustained by proof of any amount of coin, or of any such note, although the particular species of coin of which such amount was composed, or the particular nature of such note, shall not be proved."

This statute has been applied to informations as well as indictments. [State v. Calvert, 209 Mo. 280, 285, 107 S. W. 1078, 1079.] In 54 Corpus Juris, section 94, page 1038, it is said:

"In an indictment or information for robbery by taking money, it is customary to allege the amount taken, and an additional allegation as to value is often included. But as the term money itself imports some value, of which fact the court will take judicial notice, it is not necessary, even when the allegations must show some value, to describe money with respect to its value, and, at least in the absence of preliminary objection, an allegation that money of value unknown was taken will support a conviction for robbery." [See,

also, People v. Fiereto, 303 Ill. 186, 135 N. E. 417; People v. Carpenter, 315 Ill. 87, 145 N. E. 664.]

■ II. The next assignment is that the trial court erred in permitting the prosecuting attorney on cross-examination to ask the appellant if he was at the place of the attempted robbery with Joe Buchanan on the night it occurred. It is contended this went beyond the range of his examination in chief, in violation of Section 3692, Revised Statutes 1929. On direct examination the appellant swore he never at any time made an assault upon the prosecuting witness, Mitt Robinson, or attempted to rob him, either alone or in company with anyone else; that he was not present at any time when anybody else assaulted Robinson; and that he had nothing to do with the assault and attempted robbery, if any, on December 29, 1929. There had also been testimony implicating Joe Buchanan as one of the four robbers. In these circumstances the prosecuting attorney's question was proper. [State v. Hawley, 51 S. W. (2d) 77.] The substance and effect of the appellant's testimony was to deny that he was present when the attempted robbery occurred. The State was entitled to ask him questions reasonably tending to impeach him on that point. An inquiry whether he had not been at the place where the crime was committed on the night of its commission with one of the alleged robbers, came within the legitimate range of cross-examination.

■ III. In rebuttal the State produced four witnesses who testified the general reputation of the appellant for morality in the community where he lived was bad. Appellant assigns this as error for two reasons: first, because no time was fixed; and, second, because the prosecutor's questions and the witnesses' answers thereto were directed to the appellant's reputation for morality or general character and were not limited to particular traits such as would affect only his credibility as a *witness* without prejudicing him as a *defendant*.

On the first proposition, since such impeaching testimony is directed at the credibility of the defendant as a witness, logically it should be addressed to the time of trial, that is to say, the showing should be as to his character when he testifies. [28 R. C. L. sec. 218, p. 632; 40 Cyc. p. 2597; 2 Wigmore on Evidence (2 Ed.) sec. 927, p. 312; Jones on Evidence (3 Ed.) sec. 859, p. 1354.] But the testimony as to reputation may cover a connecting period theretofore, or be based on knowledge acquired at some prior time, if not too remote. And even a showing that a witness's reputation was bad three years before the trial, without any proof as to what it was at the time of the trial, was held competent in one case, the witness having had no established residence during the intervening time. [Lindsay v. Bates, 223 Mo. 294, 310, 122 S. W. 682, 687.] The matter is confided largely

to the discretion of the trial court. Some authorities say the inquiry should be confined to the defendant's reputation prior to the commission of the offense, or to his rumored connection therewith, or to his arrest therefor (not the time of trial), on the theory that the mere charge itself might prejudicially affect his reputation thereafter. [3 Wigmore (2 Ed.) sec. 1618, p. 368; 1 Greenleaf on Evidence (16 Ed.) sec. 461 d, p. 586; State v. Marks, 16 Utah, 204, 208, 51 Pac. 1089; Windom v. State, 18 Ala. App. 430, 433, 93 So. 79.] Such, apparently, is the holding also in State v. Bugg, 316 Mo. 581, 584, 292 S. W. 44, 50, though that case seemingly fails to distinguish between character testimony introduced to throw light on the guilt or innocence of a defendant and character testimony offered as affecting his *credibility*. At any rate it is said not to be prejudicial error against the defendant to set that limit, State v. Hayden, 131 Iowa, 1, 7, 107 N. W. 929; and certainly this should be true where no great length of time has elapsed between the date of the offense or arrest and the time of trial—in this case about a year and five months, with two mistrials occurring in the meantime.

The four impeaching witnesses stated they resided in Caruthersville and had known the appellant for a number of years up to December 29, 1929, when the attempted robbery was committed. One witness said he did not know what appellant's reputation was on or about that particular date; but in answer to the question "Is that reputation good or bad," apparently, and in one or two instances directly, referring to the period up to December, 1929, all four answered "bad." The questions and answers are a little vague but we can see no prejudicial error. There is nothing to show the testimony was limited to a period so remote as to destroy its probative force.

On the second proposition—that error was committed because the impeaching testimony was directed to the appellant's reputation for morality generally, instead of being confined to particular traits of character such as would bear only on the question of his credibility, without detrimentally affecting his defense on the merits —State v. Archie, 301 Mo. 392, 256 S. W. 803, is cited. *(1923)* The case sustains appellant's contention but is out of line with the great weight of authority in this State on the question, both prior and subsequent.

The law is well settled that unless a defendant in a criminal case puts his character in issue the State cannot attack it for the purpose of throwing light on the question of his guilt or innocence; and even then the evidence *pro* and *con* as to his reputation must be confined to the particular traits involved in the offense charged. But if the defendant take the stand, he may be *impeached* like any other witness. Ever since the decision of State v. Shields, 13 Mo. 165, in 1850 it has been the rule in Missouri that in discrediting a witness by character

testimony, a party is not limited to proof of his bad reputation for truth and veracity alone, but may show his general standing for morality as well. And in 1878, immediately following the enactment of Laws 1877, page 356, permitting the accused in a criminal case to testify in his own behalf, the same rule was applied in State v. Clinton, 67 Mo. 380, 391, to defendants thus taking the stand. A year later in conformity with that decision the statute was changed to its present form, Section 1918, Revised Statutes 1879; Section 3692, Revised Statutes 1929, by the inclusion (among others) of an express provision that a defendant so testifying "may be contradicted and impeached as any other witness in the case." There are now more than a score of decisions by this court holding a defendant in a criminal case who makes himself a witness may be impeached by proof that his general reputation for morality is bad. [29 West's Mo. Digest, Witnesses, sec. 337 (2), p. 447.]

The doctrine is not in accord with the weight of authority elsewhere, nor has it the approval of commentators. [40 Cyc. p. 2595; 28 R. C. L. sec. 210, p. 622; Jones on Evidence (3 Ed.) secs. 860, 861, pp. 1356, 1360; 1 Greenleaf on Evidence (16 Ed.) sec. 461a, p. 576; 2 Wigmore on Evidence (2 Ed.) sec. 922, pp. 301, 304.] It has not had smooth sailing in Missouri. BURGESS, J., dissented from the enforcement thereof in State v. May, 142 Mo. 135, 150, 154, 43 S. W. 637, 641, 642; and Fox, J., though following it, incorporated a lengthy and vigorous protest in his opinion in State v. Pollard, 174 Mo. 607, 618, et seq., 74 S. W. 969, 971. Several of our decisions damn it with faint praise by planting themselves explicitly and solely on precedent. Nevertheless the "morality rule" persists as the law of this State.

The fundamental inquiry in determining the credibility of a witness is his veracity. It may be true that a person whose general moral character is bad will be less likely to tell the truth than one whose character is good, but since there is such a relation between character and credibility, if the witness's reputation for general morality be bad, why should not his reputation for veracity ordinarily be the same; and why should the impeaching witnesses not be asked that ultimate question? On the other hand, if in spite of a bad reputation for general character, qualified impeaching witnesses are unable to say the (reputed) veracity of the person under investigation is bad, why should an uninformed jury be permitted to draw that conclusion? Furthermore, bad moral character comprehends and includes any and every trait involving moral turpitude. State v. Edmundson, 218 S. W. 864, 865; and by permitting impeachment by proof of bad reputation for morality, many collateral issues may be drawn into the case in the loosest sort of way. It has been held, even, a witness may be impeached by showing specifically he bears a reputation of being a common drunkard, State v. Grant, 79 Mo. 113, 133 (see also State

v. Edmundson, supra, 218 S. W. l. c. 866) ; or as a " 'scrapper' or fighter," State v. May, supra, 142 Mo. l. c. 151, 43 S. W. l. c. 641; or for honesty and fair dealing, State v. Archie, supra, 301 Mo. l. c. 407, 256 S. W. l. c. 808; or for chastity and morality, State v. Pollard, supra, 174 Mo. l. c. 618, 74 S. W. l. c. 971; and, as stated in the beginning, for morality according to the holding in many cases.

██ This brings us to the point raised by appellant. When the accused in a criminal case takes the stand he occupies a dual position. As a *defendant* his character cannot be assailed by the State (where he has not put it in issue) ; and as a *witness* it can be. If proof of his bad character has the effect of prejudicing him in *both* relations, as where the reputed trait specifically shown is one involved in the crime charged, or where the all-inclusive term "morality" is used, what rule should be followed? State v. Archie, supra, cited by appellant, sustains his contention and holds the questions and answers should not be directed to the defendant's general *morality,* but that particular traits ought to be specified such as might affect his credibility and not his defense. In other words, the Archie case in effect practically abolishes the morality rule, because there are very few crimes the commission of which would not involve moral turpitude, and hence there seldom could be an impeachment for bad general moral character. But such is not the law as declared in our decisions both before and since, though they are inconsistent.

In State v. Pollard, supra, 174 Mo. 607, 74 S. W. 969, a prosecution for carnal knowledge of a female ward, the defendant was permitted to be impeached for *chastity.* In State v. Beckner, 194 Mo. 281, 296, 91 S. W. 892, 896, 3 L. R. A. (N. S.) 535, a testifying defendant was charged with murder and the State impeached him by proving he bore a bad reputation as a violent, turbulent and dangerous man. It was held the admission of this evidence was prejudicially erroneous because it assailed his character but "did not tend to affect his credibility." The necessary inference to be drawn from this decision is that if the testimony had affected the defendant's credibility it would have been competent; but that a mere tendency to belligerence does not impugn a man's moral character. [See, also, State v. Richardson, 194 Mo. 326, 342, 92, S. W. 649, 654; State v. Shuster, 263 Mo. 600, 603, 173 S. W. 1049; State v. Baird, 288 Mo. 62, 67, 231 S. W. 625, 627, 15 A. L. R. 1035.]

On the other hand, in State v. Wellman, 253 Mo. 302, 314, 161 S. W. 795, 798, it was held a defendant cannot be impeached by proving his reputation bad for committing the class of crimes for which he is on trial, and that the State cannot single out his propensity or reputation for violating some particular law. State v. Baird, 271 Mo. 9, 16, 195 S. W. 1010, 1013, rules that in the impeachment of a witness the sole question is his reputation for truth and veracity, "or at most this phase of reputation and that of morality." State

v. Ross, 306 Mo. 499, 506, 267 S. W. 853, 854, declares the State has no right to prove the defendant's reputation bad "in the particular respect which would affect his guilt or innocence of the crime charged," and that "the evidence should be limited to the simple question as to the defendant's reputation for morality." In State v. Bugg, supra, 316 Mo. l. c. 584, 292 S. W. l. c. 50, where the charge was robbery, and in State v. Irvin, 324 Mo. 217, 222, 22 S. W. (2d) 772, 774, where it was larceny, the opinions go so far as to hold the defendants could not be impeached by proof of bad reputation for *honesty and fair dealing,* because those traits were involved in the offenses charged. On that theory, if a defendant were charged with perjury he could not be impeached even for truth and veracity. State v. Gant, 33 S. W. (2d) 970, 973, rules the impeachment may go to the defendant's general reputation for morality, but not to good citizenship, as "that is too indefinite." Other very recent cases recognize it as settled law that a defendant may be impeached for morality. [State v. Gentry, 320 Mo. 389, 404, 8 S. W. (2d) 20, 27; State v. Taylor, 320 Mo. 417, 430, 8 S. W. (2d) 29, 35; State v. Bundy, 44 S. W. (2d) 121, 123.]

The trend of late decisions, as shown in the preceding paragraph, has been toward confining the State's impeaching evidence, by reputation, to such traits as veracity and honesty, and to general morality. In the opinion of the writer the "morality rule" is impractical, confuses the issues, and is unfair to the defendant. The very fact that there is a growing tendency to restrict the scope of the testimony is a recognition of this. The doctrine is now fairly well established that the State cannot *single out* specific traits such as would tend to prejudice the accused in his character as a defendant, under the guise of impeaching his credibility. It would be much better if Missouri were fully in line with the prevailing view elsewhere and the inquiry were limited to the real issue—reputation for veracity, or honesty, which latter is simply straightforwardness in deed as well as word (Webster's New International Dictionary).

But so long as the law permits (as it does now) the impeachment of *any* witness by proof of his reputation for general morality, a defendant may be subjected to like test. The statute, Section 3692, Revised Statutes 1929, so provides. The fact that he is incidentally prejudiced as a defendant will not prevent it. The situation is the same as any other where evidence is competent for one purpose but incompetent for another. [1 Greenleaf on Evidence (16 Ed.) sec. 444b, p. 569; 1 Wigmore on Evidence (2 Ed.) sec. 215, p. 457.] So far as may be, the matter can be controlled by instructions. [State v. Weeden, 133 Mo. 70, 84, 34 S. W. 473, 476: State v. Phillips, 233 Mo. 299, 306, 135 S. W. 4, 5.] Speaking on the general subject, State v. Edmundson, supra, 218 S. W. l. c. 865, says:

"It is also true that, since general bad moral character is broad

enough to include every trait which can be drawn in question in prosecutions for any offense involving moral turpitude, the defendant, by such evidence, is exposed, not only to an attack upon his veracity, but to one upon his character with respect to the trait in issue in the particular case as well, and this before he has put it in issue otherwise than by offering himself as a witness. These arguments, however . . . go to the soundness of the rule."

 IV. The State read in evidence an application filed by the appellant and his codefendants before a former trial. It is contended this was error, because only such part of the application as might impeach *him* or contradict some admission of *his* was competent for any purpose whatever. Appellant fails to point out anything specific in the application which was prejudicial to his defense and not legally admissible. It did contain long *ex parte* recitals of what certain alleged absent witnesses would say, and these were all in his favor. This point is ruled against the appellant.

 V. In rebuttal the State produced a witness, Billy O'Pollock. He was asked if he had had a talk with the appellant or one of his codefendants in which they told him they were going to hold up Mitt Robinson's crap game. The witness admitted he did talk with Joe Buchanan, one of the defendants. But he was unable to fix the time or give any definite account of the conversation and the whole matter was excluded by the court and withdrawn from the consideration of the jury, after considerable dialogue and discussion, covering some seven pages of the record. We find no prejudicial error in this.

 During the course of the discussion counsel for the appellant moved the court to rebuke counsel for the State for asking prejudicial leading questions. The court said: "I don't think it was the intention of counsel to make improper remarks before the jury;" and then instructed the jury to disregard the leading statements. The court then asked some questions. There was no error in any of this.

Finding no error in the record, the judgment is affirmed. All concur.