## THE STATE v. WALTER A. ARCHIE, Appellant.

Division Two, December 3, 1923.

1. **DEFENDANT'S UNIMPEACHED REPUTATION:** Attacked Under Guise of Morality. In a case of homicide the State 'cannot, by proof, attack the general reputation of the defendant for peace and quietude, where he has introduced no evidence on the subject, although he has been sworn as a witness and testified in his own defense. And for a like reason, counsel for the State cannot, indirectly and under the thin guise of pretending to attack the general reputation of defendant for morality, get before the jury as a fact that defendant's general reputation for being a quiet, peaceable and law-abiding citizen is bad.

2. ————: ————: Reputation for Morality: Proof of Quarrelsomeness and Turbulence: Instructions as Cure. The State has the legal right to show that defendant's moral character is bad in respect to such matters as would authorize the jury to conclude therefrom that he cannot be relied upon to tell the truth; but where no witness has testified that his general reputation for truthfulness and veracity is bad or had ever been questioned, to permit numerous witnesses for the State, in rebuttal, after defendant has testified, to answer, in reply to inquiries concerning his general reputation for morality, that such reputation was bad, that he was "a quarrelsome man," that he was not "a good law-abiding citizen," and to explain that by morality they meant "just anything that was mean or bad," not a "fighting man," "a good, moral, quiet, peaceable man," and to permit counsel for the State to say to the

State v. Archie.

jury that "I don't think a man would be a moral man if he wasn't peaceable" and that morality "would include his general conduct for being a law-abiding citizen, sober man, truthful man, it would include all those ingredients," is to improperly inject into the case illegal matters, for the undoubted purpose of creating in the minds of the jury an unwarranted prejudice against defendant, so hurtful that it is not cured by instructions telling them to disregard the evidence in regard to defendant being a quarrelsome or turbulent man.

3. REPUTATION FOR MORALITY: In What Words Inquiry Should be Couched. If the State desires to show that defendant's reputation for morality is bad, the witnesses should be asked if they know his general reputation in the community where he lives for honesty and fair-dealing. To ask them whether they know his general reputation for morality is to leave them in the dark as to what elements of morality are sought to be elicited, and to open wide the door for the consideration of elements of immorality, which do not affect his credibility.

Appeal from New Madrid Circuit Court.—*Hon. Henry C. Riley*, Judge.

REVERSED AND REMANDED.

*Ward & Reeves* and *Gallivan & Finch* for appellant.

Conduct of counsel for the State in asking questions seeking to elicit improper and prejudicial evidence, even though excluded by the court, is sufficient to reverse a case where it is clear that the questions are asked for the purpose of getting before the jury by indirect methods what was incompetent. State v. Webb, 254 Mo. 434; State v. Lasson, 238 S. W. 101; State v. Burns, 228 S. W. 767; Levels v. Railroad Co., 196 Mo. 623; Wojtylak v. Coal Co., 188 Mo. 286; State v. Jackson, 95 Mo. 652; Epland v. Railroad Co., 57 Mo. App. 162; Beck v. Railroad, 129 Mo. App. 7; Gore v. Brockman, 138 Mo. App. 235; Trent v. Printing Co., 141 Mo. App. 437; Moore v. Doerr, 199 Mo. App. 428; Jackman v. Railway Co., 206 S. W. 246.

*Jesse W. Barrett,* Attorney-General, and *Allen May,* Special Assistant Attorney-General, for respondent.

The defendant in a criminal case, as any other witness, may be impeached by evidence of bad reputation for morality. State v. Edmundson, 218 S. W. (Mo.) 864; State v. Beckner, 194 Mo. 289; State v. Shields, 13 Mo. 236. The inquiries permitted to be directed to character witnesses by counsel for the State were within the reasonable purview of the term "morality." State v. Edmundson, 218 S. W. (Mo.) 864; "Morality" as defined in Webster's New International Dictionary, Funk & Wagnall's New Standard Dictionary and New Century Dictionary & Cyclopedia.

RAILEY, C.—On August 15, 1922, the Prosecuting Attorney of New Madrid County, Missouri, filed in the circuit court of said county an information, charging Walter A. Archie with murder in the first degree, for the killing of one J. H. Sharp, in said county, on July 8, 1922. Upon a trial before a jury, defendant was found guilty of murder in the second degree, and his punishment fixed at twenty years' imprisonment in the penitentiary. Motions for a new trial and in arrest of judgment were filed, overruled, sentence pronounced, and judgment rendered, from which defendant appealed to this court.

The testimony on behalf of the State tends to show that deceased was sixty-six years of age when killed, and had lived in New Madrid County, off and on, for twenty years; that his general reputation, as disclosed by his neighbors, was that of a quarrelsome, turbulent and dangerous man. The cross-examination of these witnesses tended to show that deceased was quarrelsome rather than violent or dangerous. It appears from the evidence that defendant, at the time of trial, was thirty-seven years of age; that he was the father of six children, the oldest of whom was fourteen years of age, and lived about three hundred yards from deceased; that he had lived in this community for three years prior to the homicide; that after the first six months of said period,

he continuously had trouble with deceased; that during the last two years of his life, deceased had made all manner of threats, both by word and deed, against the life of defendant, many of which were couched in the vilest and most brutal language; that many of these threats were communicated to defendant, and others were not, but the defendant himself testified to abundant knowledge of deceased's attitude toward him, coming from no less than nine persons; that as a result of the foregoing, defendant was afraid of deceased.

Witness Redfering, in behalf of the State, testified that about eighteen months before the killing he heard defendant say: "Some of these days you will hear of me shooting that old man." Witness told defendant that the old man was a pretty good shot, and defendant replied, "If he gets me it will be after I shoot sixteen shots; I have got two good automatics."

Mrs. Ella Winters, also a witness for the State, testified that about the 12th of August, 1920, the deceased, one Hancock and the surveyor came through defendant's yard, and the latter got a gun, and said: "I will kill the old s— b—; I have told him never to come on my premises again."

The residence of defendant is on the north side of an east-and-west road, and west of a north-and-south road, the intersection being near the house. The ground surrounding defendant's house is from two to three feet higher than the east-and-west road where deceased was killed. Gene Keene, also known as Jim King, lived west of defendant's house, and deceased lived still further west. James Tyner lived northwest of the defendant about one hundred yards, and there were no buildings between his house and that of defendant. The barn of the latter was east of his house, and about fifteen to twenty steps from the east-and-west road. East of defendant's barn was the pasture of deceased, in which the latter kept his cow. The deceased had been cultivating eleven acres of land toward the river, east of said pasture, and had to pass by defendant's house in going

to it. It appears from the State's evidence that about five o'clock on the morning of July 8, 1922, defendant's son went to the Tyner home, and borrowed a shotgun, which Tyner told him was loaded. The boy took the gun to his father's house. About ten minutes thereafter the report of a gun was heard from the direction of defendant's residence. Miss McCreary, Tyner's step-daughter, went on the porch of their residence, and from there saw defendant come around the corner of a storm house, at the northwest corner of his house, and about three steps from his porch. The defendant called to her and said: "You tell Jim to come over here and help me take this old devil away from here." No one went from the Tyner home, but defendant's son, in a few minutes after the shooting, went to King's house, found him at work splitting wood, and got him to come to defendant's home. King had heard the shot fired, while he was at work in his yard. He found defendant, on his arrival, three or four steps from his porch. King found the body of deceased eight or ten feet west of the front part of defendant's house; eight or ten feet north of the fence on the south side of the east-and-west road; and about fourteen or fifteen feet from a buggy, which was standing in front of appellant's house, on the north side of the east-and-west road; deceased's body was lying south and east of said buggy. When King approached, defendant came out to the fence on the south side of his home, and asked King if he saw that old man lying there, and if he saw that knife. He pointed out to King an open pocket-knife lying three or four feet from the body of deceased. The head of deceased's body was toward the west. His pipe and glasses were lying near him. There were bloody spots on the head from the eyes back, on the right side. Defendant did not tell King he had killed deceased, but said "he had stood it as long as he could."

At the request of the coroner, Doctor Martin examined the wounds on deceased, and said the shot struck all over the right side of the face and head; that they ranged inward, downward and forward. On cross-exami-

nation, Doctor Martin testified that one shot struck on the forehead and went across; that others struck down the right side of the face, and down on the neck; that he did not see any hole back of the ear, except that which was made by one shot; that scattering shot seemed to have struck him back of the ear; that the shot were pretty well scattered over the head and face.

The evidence in behalf of the State tended to show that the knife lying near deceased when King arrived, had been the property of deceased, and was lost by him about two weeks before the homicide; that during the last two weeks of his life deceased had been using a much smaller knife, which was taken from his pocket by the coroner. There is evidence in the record tending to show that a knife, similar in appearance to the one found lying near deceased, was in possession of defendant before the shooting, and was shown by him to witnesses, with the statement that he had found it.

The coroner got from Tyner the shot gun used by deceased, and in the left barrel of same there was a shell, with a ring cut around it with a knife. Seach was made for the empty shell, but it could not be found. It appears in evidence that by cutting a shell in the above manner, it will carry the cut part out of the gun, and cause the shot to become bunched. The defendant testified to this effect, and said he had ringed some shells for duck shooting in this way, for use in said shotgun, about one month before the killing. The shell found in the gun was loaded with 3½ grains of powder, and 1¼ ounces of No. 2 shot. Tyner testified that defendant had frequently used this gun early in the summer, for shooting ducks; that he brought the gun home from defendant's house on July 4th, and upon arriving at home he broke the gun and saw that it was loaded; that he left it that way, until defendant's son got it on the morning of the shooting, at which time he told the boy the gun was loaded; that defendant was told by his son that the gun was loaded.

Defendant's testimony, in addition to the facts heretofore stated, tends to show that, on the morning of the killing, defendant and his family were planning to go after berries; that the plans were made two days before, but were postponed on account of rain; that defendant planned to hunt squirrels on said trip; that he had at his home a Remington automatic pistol, and a Winchester rifle, and had owned them for several years, but sent after the shotgun to use in shooting squirrels, pursuant to the plans above mentioned; that defendant's son, after bringing the Tyner shotgun to his father, where the buggy was standing in front of the house, went to the barn to take care of the horses; that while there, he heard a gun fire once, and heard his mother scream; that he stepped out of the barn, and saw his father crossing over the fence with the shotgun in his hand; that he went after King, and did not know how the shooting occurred; that he heard no fussing.

The wife of defendant testified to the same general facts. She further testified that she heard deceased talking in an angry voice about dogging cows, and went out on the porch; that she saw deceased with an open pocket knife in his hand, standing in the road, making profane threats against her husband, who was standing by the buggy, with a distance of about five steps between them; that deceased, still holding the knife in his right hand, put his left hand toward his breast; that she then put her hands to her ears, screamed and ran into the house where she heard a shot fired; that she did not see her husband have a gun before the shot; that when she saw Sharp he was going west, walking toward his home in the public road; that he was never closer than four or five steps to her husband, at any time she saw him, and was in the traveled highway. She admitted that she told the coroner and other persons that there were no eye witnesses to the killing.

The appellant related at great length his relationship with deceased, his efforts to be friendly, the numerous threats, and great abuse inflicted upon him by de-

ceased directly, and other threats that were communicated to him by others, as made by deceased. He denied having called to Opal McCreary to send Jim Tyner down to his house after the shooting. Defendant testified that the knife found by the body of deceased was not the knife he found and showed to the witnesses for the State. He produced another knife, which he said was the one referred to in that conversation. He contradicted the testimony of the State's witnesses as to the alleged threats made by him against deceased. He testified, in substance, that he was out in front of his house fixing his buggy, when deceased came along, and profanely inquired of defendant why he was dogging deceased's cow; that he advised deceased that the dogs were after Hampton's cow, but not after his cow; that deceased then called him a G—d liar; that he told deceased he wanted no trouble with him, but deceased announced he was going to have trouble, and went on east along the road; that he thought deceased was going to his farm on the river; that he paid no more attention to the matter and went to work on his buggy; that he thereafter sent the boy over to Tyner's after the shotgun; that the boy brought the gun back and told him it was loaded; that he set the gun up in the buggy, and soon afterwards deceased came back, indulging in more profanity; that Sharp put his right hand in his pocket, pulled out an open knife, used the foulest language possible, and threatened to cut defendant's guts out; that Sharp was then eighteen to twenty feet away; that he reached over, got the gun and advised deceased not to come at him with the knife; that deceased threw his left hand to his bosom, announcing that if he could not carry out the former threat he would blow out defendant's brains; that said threat was accompanied by profane and foul language; that he then shot deceased, in self-defense and to save his own life. On cross-examination, defendant admitted that deceased was in the public road and more than fifteen feet away when he shot and killed him.

The State offered certain testimony, alleged to be in rebuttal, which will be referred to hereafter.

The instructions, rulings of the court, and such other matters as may be deemed of importance, will be considered in the opinion.

I. It is contended by counsel for appellant that the trial court committed reversible error in permitting Mr. McKay, special prosecutor for the State, to get before the jury improperly, and in violation of law, the fact that defendant's general reputation for being a quiet, peaceable and law-abiding citizen was bad, although appellant offered no evidence in support of his character. The law is well settled in this State that, in a case of homicide, like the one before us, the State cannot attack the general reputation of appellant for peace and quietude, over his objection, where the latter has introduced no evidence on this subject, although he was sworn as a witness and testified in the cause. [State v. Barker, 249 S. W. (Mo.) l. c. 78; State v. Baird, 271 Mo. 16, 195 S. W. l. c. 1013; State v. Shuster, 263 Mo. 600, 173 S. W. 1049; State v Richardson, 194 Mo. l. c. 342-3-4; State v. Beckner, 194 Mo. 281, 291-2.] If the State, over the objection of defendant, had been permitted by the trial court to prove that defendant's general reputation for being a quiet, peaceable law-abiding citizen was bad, when he had offered no testimony in relation to the matter, it would have been our plain duty, under the authorities supra, to reverse and remand the cause. The special counsel for the State in this case, in utter violation of the principles of law declared in the above authorities, under the thin guise of pretending to attack the general reputation of defendant for morality, improperly and illegally got before the jury, testimony tending to show that he was a quarrelsome and dangerous man. Here is what occurred at the trial:

Adam Schneider was the first witness examined in behalf of defendant. On cross-examination he was asked

*Marginal note:* Attacking Indirectly Defendant's General Reputation.

by special counsel if he was acquainted with defendant's reputation, and after the court sustained an objection thereto counsel withdrew the question. At the opening of the defense he was admonished that this class of testimony was improper, yet, at the conclusion of defendant's testimony, counsel produced six or seven witnesses in rebuttal, and proceeded as follows:

George Schneider, the first witness in rebuttal was asked:

"Q. Are you acquainted with his (defendant's) general reputation in the community where he lives up there for being a violent, turbulent, dangerous man?"

The question was objected to, the ruling of this court in State v. Baird, 271 Mo. l. c. 9, was called to the attention of the court, and said objection sustained. Counsel for defense asked the court to rebuke special counsel for asking such a question, which the court refused to do, and an exception was saved to such ruling. Thereupon counsel asked said witness, over the objection of defendant, the following question:

"Q. Are you acquainted with the general reputation of the defendant Archie up there for morality? . . .

"Q. That's made up by what the people say about him, and not what you personally know about him? A. Yes, sir. . . .

"Q. Is that reputation good or bad? . . . A. Bad."

When asked on cross-examination what he meant by morality, he answered that he meant defendant was not "a good law-abiding citizen."

The second witness in rebuttal was Jerd Dawson, who was asked the same question, based upon morality, and, over defendant's objection, answered that his reputation for morality was bad. Here is what this witness testified on cross-examination:

"Q. What do you mean by morality? A. Well, if I understand it right, it means a man's character.

"Q. For what? A. Just anything mean—bad.

"Q. Just anything is morality with you? A. Yes, sir."

301 Mo.—26

He testified that he and other witnesses had been in consultation with counsel for the State on the morning of the trial, and that they had no talk about morality.

Burris Bard, the next witness in rebuttal, was asked the same question, as to defendant's general reputation for morality. Witness then asked, if that meant truthfulness. Counsel for the State told him, that was included in morality. Thereupon the witness answered, that defendant's reputation in that respect was good. Not content with the above answer, counsel for the State, in the presence of the jury, in defining morality, said: "That would include his general conduct for being a law-abiding citizen, sober man, truthful man, it would include all those ingredients." Thereupon the witness was excused.

W. B. Redfering was next called in rebuttal, and the same question was propounded to him in relation to morality. He said defendant's reputation for morality was bad. On cross-examination, he was asked what he meant by morality, and said: "I mean a good, moral, quiet, peaceable man." On motion of defendant, the above answer was stricken out. Thereupon Mr. McKay, in the presence of the jury, said: "I don't think a man would be a moral man, if he wasn't peaceable." The court again sustained the motion to strike out said answer.

Adam Schneider was next produced in rebuttal, asked the same question in regard to morality, over objection of defendant, and testified that defendant's reputation was bad. On cross-examination the following occurred:

"Q. What do you mean by morality? A. Being kind of a quarrelsome man."

On motion of defendant the above answer was stricken out, and the witness excused.

Mr. McKay next introduced Mr. John McFarland in rebuttal, had him say he knew defendant's general reputation for morality, and, over defendant's objection, was permitted to say it was bad. On cross-examination, he was asked what he meant by morality, and answered,

"Well, fighting." On motion of defendant, his answer was stricken out, and the witness excused.

Mr. McKay then examined Hugh Dunn, in rebuttal, and here is what occurred:

"Q. Were you acquainted with his (deceased's) general reputation up there in that community prior to his death for being a peaceable, law-abiding citizen? A. Yes, sir.

"Q. Was that reputation good or bad? A. It was fairly good.

"Q. Do you know the defendant Archie? A. Yes, sir, I know him slightly.

"Q. Acquainted with the people up there generally in that community? A. Yes, sir.

"Q. Are you acquainted with his general reputation in the community where he lives up there, for morality, being made up by what you hear the people generally say about him."

The witness said he did not know "what it means," and asked for an explanation. Thereupon Mr. McKay said:

"Mr. Dunn, that would include if he is a drinking man or sober man, if he is a quiet, peaceable man, gets along with—agreeably and justly with his neighbors, friends and acquaintances, and it would include any trait of character that goes to make up a good citizen."

Defendant objected to the question, and after some talk by counsel, the court, said:

"Mr. Dunn, was this man immoral and unchaste, that is, co-habiting and associating with lewd women and such as that? I think that's the only question."

The witness answered that he "never heard a word about him in that respect." Thereupon the witness was excused.

We have before us, in this record, a man being tried for murder, with his life at stake. He tendered no issue as to his general reputation for being a quiet, peaceable and law-abiding citizen. He did, however, testify fully as to all the facts in the case. His character for truth-

fulness and veracity was open for investigation before the jury, and yet, not a witness was produced who testified that his general reputation for truthfulness and veracity was bad, or had ever been questioned. Under the rulings of this court, the State had the legal right to show that defendant's moral character was bad, in respect to such matters as would authorize the triers of fact to conclude therefrom that he could not be relied upon to tell the truth, under the circumstances of this case.

To illustrate our meaning, in respect to the above matter, defendant's moral character might be attacked by showing that his general reputation in the community where he lived for honesty and integrity was bad. From this showing, the jury might infer, that a dishonest man would be more likely to testify falsely than one whose character was unimpeached.

The converse of this proposition is well stated by Judge WALKER in State v. Taylor, 238 S. W. l. c. 491, as follows:

"It is elementary under our procedure that proof of good character may be offered by a defendant in a criminal case to lessen the probability of guilt. This rule, however, has a well-defined limitation in that the nature of the proof offered should be restricted to the traits of character involved or which may affect the offense charged. [State v. Beckner, 194 Mo. l. c. 292, 91 S. W. 892, 3 L. R. A. (N. S.) 535, and cases cited.]"

GANTT, J., in the well considered case of State v. Beckner, 194 Mo. l. c. 291-2, in discussing this subject, said:

"As already seen, unless the defendant has first offered evidence of good character in exoneration from the crime charged, the State has no right to attack his character as bad, and even when this is the case, the approved rule is that both the defendant and the State are restricted to evidence as to his character *pro* and *con* as to the specific trait involved in the controverted act or offense; in a word, the proof of character offered as a

defense to a charge of crime and evidence rebutting such character must be such as bears analogy and reference to the nature of the charge on which the defendant is being tried. [1 Wigmore on Ev. sec. 59, and cases cited in note.] The ground upon which such testimony is admissible is that good character tends to lessen the probability of guilt. [3 Greenleaf's Ev. (15 Ed.) sec. 25; State v. Anslinger, 171 Mo. l. c. 608-9; State v. Dalton, 27 Mo. l. c. 15, 16; State v. King, 78 Mo. 556.]''

In the still more recent case of State v. Barker, 249 S. W. l. c. 77-8, WHITE, J., in considering the action of the State in getting before the jury illegal evidence, as in this case, said:

''The State contends that the evidence was not erroneous because it was proper to rebut the proof of the alibi even if it was necessary to show that other crimes had been committed. All the evidence relating to the presence of the defendant in Springfield could have been shown without introducing the insinuations; without showing that defendant was watched or suspected, under the guise of fixing dates.

''Further, this testimony was a thinly veiled attempt to attack the defendant's character. He had not put his character in issue. He had testified as a witness, and it was entirely proper for the State to introduce evidence to impeach his credibility as a witness, but his general character was not in issue, and the State had no right to attack it. State v. Shuster, 263 Mo. l. c. 602, 173 S. W. 1049; State v. Beckner, 194 Mo. l. c. 294, 91 S W. 892, 3 L. R. A. (N. S.) 535; State v. Baird, 288 Mo. 62, 231 S. W. l. c. 627, 15 A. L. R. 1035.]

''There was enough of this kind of evidence to place before the jury the picture of the hardened automobile thief who had been under surveillance of the police for months. It was prejudicial, and we believe the objections to it were sufficiently specific to necessitate a reversal of the case.''

The other cases heretofore cited are to the same effect.

At the conclusion of the trial, the court instructed the jury to disregard the illegal evidence in regard to defendant being a quarrelsome, fussy or turbulent man. We are of the opinion that the action of the court in excluding from the consideration of the jury the illegal and damaging evidence which had been admitted over defendant's objections, and in the face of our rulings on the same subject, was inadequate to meet the situation, and to relieve the defendant from the legal wrong which he had suffered.

In the recent case of State v. Burns, 286 Mo. 1. c. 671-2, where the special counsel herein represented the defendant, in discussing a similar state of affairs, we said:

"The trial court has a good deal of latitude in dealing with this subject, but in cases like the one before us, where the attorneys for the State deliberately overstep the rules of propriety, ignore the positive rulings of this court, and attempt to get before the jury matters which they know are improper, for the undoubted purpose of creating in the minds of the jurors an unwarranted prejudice against defendant, in a close case like this, the ends of justice require that a new trial should be granted defendant, although the court below may have formally sustained an objection to the proffered evidence. [Levels v. Railroad Co., 196 Mo. 1. c. 623-4; Wojtylak v. Coal Co., 188 Mo. 1. c. 286-7 ; State v. Jackson, 95 Mo. 1. c. 652-3; Ephland v. Ry. Co., 57 Mo. App. 1. c. 162-3; Beck v. Railroad, 129 Mo. App. 7; Gore v. Brockman, 138 Mo. App. 1. c. 235, and cases cited; Trent v. Printing Co., 141 Mo. App. 437; Moore v. Doerr, 199 Mo. App. 428, 203 S. W. 1. c. 673; Jackman v. Ry. Co., 206 S. W. 1. c. 246-7; Collier v. City of Shelbyville, 219 S. W. 1. c. 714; Rudiger v. Ry. Co., 77 N. W. (Wis.) 1. c 171-2; Stratton v. Nye, 63 N. W. 1. c. 929; Martin v. State, 63 Miss. 1. c. 507; Cross v. State, 68 Ala. 476; State v. Smith, 75 N. C. 1. c. 307-8; Rudolph v. Landwerlen, 92 Ind. 34-5; Magoon v. Ry. Co., 31 Atl. (Vt.) 156; Tucker v. Henniker, 41 N. H. 1. c. 322.]''

To the same effect is our ruling in State v. Lasson, 292 Mo. 1. c. 166 and following.

Without pursuing this branch of the case further, we are of the opinion that the ends of justice require that a new trial should be granted herein. Counsel should not be permitted to do indirectly, that which they were expressly prohibited by law from doing.

II.   The foregoing facts disclose the necessity of having the question relating to defendant's general reputation for morality, couched in proper legal language, before the witness is permitted to answer same. That is to say, by way of illustration, if the State

**Morality:**  desires to attack the credibility of defendant by
**Wording:**  showing that his general reputation for honesty
**Inquiry.**  and fair dealing is bad, the question should be asked whether the witness, knows the general reputation of defendant in the community where he lives for honesty and fair dealing, instead of asking whether he knew defendant's general reputation for morality. With the question thus propounded, the defendant would be informed as to what he had to meet. The witness would not be left in the dark as to the kind of morality sought to be elicited, and the court would be in position to determine whether the species of morality inquired about could be considered by the jury, in passing upon defendant's credibility as a witness.

The witnesses in rebuttal were asked if they knew the general reputation of defendant for morality. They answered in the presence of the jury that they did, and were permitted, over defendant's objection, to say it was bad. Upon inspection of the testimony of said witnesses, in respect to the above matter, it will be disclosed that none of them testified to any facts upon which the jury would have been justified in discrediting the testimony of defendant, yet they were all permitted to tell the jury that defendant's reputation for morality was bad. We accordingly hold that the form of the questions propounded in chief to the witnesses in rebuttal operated as an

injustice to defendant, and enabled counsel for the State to deliberately get before the jury illegal and improper evidence, which the jury had no right to consider in passing upon defendant's credibility as a witness.

III. Appellant, in his motion for a new trial, challenges the correctness of the instructions given by the court. The second paragraph of instruction numbered one given by the court, reads as follows:

"If you find the defendant guilty of murder in the first degree, then you will consider whether or not under the testimony in this case, of which you are the sole judges, the defendant is guilty of murder in the second degree. . . ."

*Instruction.*

It is probable that the words "do not" were intended to be inserted in the first line of above quoted portion, between the words "you" and "find." We note, however, on examination of the transcript, that the instruction, as transcribed therein, reads as above printed. This, of course, can be corrected, on a re-trial of the case.

IV. Instruction 7, given by the court, is a literal copy of Instruction 10 given by the trial court, in State v. Rozell, 225 S. W. (Mo.) l. c. 934. We held that the giving of said instruction constituted reversible error. This instruction should be omitted in a re-trial of the case.

*Condemned Instruction.*

V. Other matters are presented and discussed in the briefs of counsel, but as all of these questions are likely to be eliminated in the next trial, we do not deem it necessary to consider them further.

On account of the errors heretofore pointed out, the cause is reversed and remanded for a new trial. *Higbee, C.,* concurs.

PER CURIAM:—The foregoing opinion of RAILEY, C., is adopted as the opinion of the court. All of the judges concur.