THE STATE v. FRANCES WILLIAMS, Appellant.—87 S. W. (2d) 175.

Court en Banc, October 18, 1935.

*Howard F. Major* and *George A. Spencer* for appellant.

*Roy McKittrick,* Attorney General, and *Covell R. Hewitt,* Assistant Attorney General, for respondent.

ELLISON, J.—The appellant, a negro woman, was convicted of murder in the second degree in the Boone County Circuit Court and her punishment assessed by the jury at ten years' imprisonment in the penitentiary, the minimum prescribed by Section 3984, Revised Statutes 1929. She shot and killed a negro named William "Dutch" Jones, who had been living with her for two years. There was no denial of the homicide; her defense was self-defense. The assignments of error in her brief and reply brief on this appeal complain of the giving of one instruction for the State; of the refusal of an instruction requested by her; of the admission and exclusion of testimony; and of alleged improper argument by the prosecuting attorney.

There were no eyewitnesses to the killing, which occurred in the appellant's home in Columbia about five o'clock in the morning of May 7, 1933. The State's proof of the detailed facts consisted mainly of a written statement given by the appellant to the police a short time afterward, which was introduced in evidence without objection. This statement was as follows:

"On the morning of May 7th, 1933, about daybreak, 'Dutch' Jones and myself returned home from a dance in Callaway County. 'Dutch' had gone to the dance without me and I had followed him out there. We quarreled there at the dance, and then started home, and while on the road home we quarreled again; this quarrel led to a fight and we got out of the car and fought a while; while we were out of the car 'Dutch' drew a gun and was going to shoot me, but instead of shooting me he shot himself in the foot. Then we got back in the car and argued some more, this time he beat me over the head with the gun. After we arrived home we argued again; this time he told me he was going to kill me. I told him he might if I did not beat him to it. I left him sitting in a chair in the front room and went into the bedroom and got a gun and went back into the front room where he was still sitting in the chair and shot him through the head. Then I ran out the front door and threw the gun away. I then went to Mayme Givans' home and told her what I done and asked her to call the police. She refused to call the police, but did call Dr. Moore, and after the Doctor arrived Mamie Givans called Stewart Parker at Doctor Moore's request."

Several of the police officers testified to oral admissions made by the appellant shortly after her arrest, substantially the same as those embodied in her written statement, but a little fuller. The principal

additional facts contained in these oral statements were that when appellant went out to the dance she found the deceased with two girls sitting on his lap; and that after appellant went to the bedroom in her home and got a pistol she came back through the front room, passed the deceased as he sat in a chair fixing his wounded foot, on her way to the front door, and then shot back at him as he sat in the chair.

The appellant lived in a house with three rooms in a row on the south side of a partition and three on the north side. Her mother had the north rooms; she occupied the east two of the south three rooms. The middle one of these was a bedroom. The east room fronted on the street with a door opening thereon. An overstuffed chair was sitting in this room three or four feet from the front door and a little south thereof, with the back toward the door. The deceased was sitting in that chair. When Dr. O. A. Moore, who was called as a witness by the State, reached the house about five A. M., evidently very soon after the homicide, he found the chair in the position just stated with blood on it. The front door was open. The deceased was lying unconscious on the floor close to the south side of the chair. There was a bullet wound in his right foot between the big toe and the second toe and a bullet wound on the right side of his face about midway between the ear and angle of the lips. This latter bullet ranged upward and backward passing clear through the brain. It was a fatal wound causing the death of the deceased. The wound in the head, in the doctor's opinion, was made with a .38 caliber pistol; and the wound on the foot with a .32 or smaller caliber pistol. The wound on the foot had ceased bleeding and had been made earlier than the head wound, which was bleeding profusely. The shoe and sock were off of the wounded foot. From the position of the chair and the course of the bullet it was the doctor's opinion that the deceased must have been sitting straight up in the chair when shot. He thought the bullet would not have ranged upward, as it did, if the deceased had been bending down over his foot at the time.

Later at the police station about eight o'clock in the morning Dr. Moore dressed the wounds of the appellant. She had a cut about one and one-half inches long on the left side of her head where the part in her hair would be, and a long three-cornered cut over the left eye, about one inch long. There were some abrasions on her left knee and a few scratches on her right knee. The wounds on her head had been made with some blunt instrument. He treated them for about ten days. Dr. Hugh P. Muir also examined the appellant's injuries at the city jail. He described them about as Dr. Moore had, except he said there was a lacerated, bruised area about the size of a pigeon egg on the left side of her head, which was bleeding a good deal.

There was also testimony, adduced by both sides, which showed that the interior of the automobile in which the appellant and the deceased rode back to Columbia from the dance (which was several miles in the country) was bloody. There were blood stains on the cushion, seat covers and floor of the car. A witness named Richard Douglas searched the car on May 15, eight days after the homicide. He found a revolver wrapped up in rags behind the seat cushion. Two empty shells were in it. It was shown that one of the appellant's attorneys had directed the witness to clean the car, which belonged to the appellant. The revolver was introduced in evidence but the record does not state the caliber of the weapon. Presumably it was the appellant's theory that this was the revolver the deceased used in beating her on the way back to Columbia from the dance. The prosecuting attorney by his questions intimated that the revolver had been "planted" in the car.

On the witness stand the appellant told about going to the dance in the country and finding the deceased there, of their drive back to Columbia, and of his beating her over the head with a revolver on the way. After they had got to her home, her account of the homicide and the events immediately preceding, was as follows: She said she wanted to call a doctor, or her mother, or somebody to dress her wounds but that the deceased would not permit it and would not allow her to go out of the house. So she undressed and put some cotton on her wounds and the deceased went in to the front room and sat down, complaining about his wounded foot. She again asked him if he was going to let her go to the doctor or call somebody and he said, "No, I ain't. I am going to kill you. I have been to the penitentiary once and I am going again." She said "You have almost killed me now." From there on her testimony was as follows:

"Then I went to the dresser and got the revolver and he was still sitting in the chair, fooling with his foot, and I come along with my clothes under my arm and went to open—went to pass him, and he was looking at his foot while I passed him, and I got to the door and he looked up at me and said, 'You son of a bitch, don't you open that door,—you ain't going out of here.' About that time, I tried to get out again and he said, 'You son of a bitch, I am going to finish you right now,' and he got up and jumped at me and that is when I fired the pistol."

The appellant testified that she shot the deceased because he declared he was going to kill her, and it was the only way that she had to protect her life; and that she was so nervous and upset when she gave her statement to the police soon afterward that she did not know what she was doing. She said she walked past the deceased as he sat in the chair, and attempted to go out the front door because the back door of the house was fastened tight and was hard to open.

She also said she was afraid to go out the back way and that there would be a better chance to go out the front door because it was easy to open. She stated she could not have run out behind the house because there were rocks out there, and a picket fence which would have forced her to come back by the side of the house and she was afraid the deceased would get her if she came that way. In rebuttal the State showed that if she had gone out the back door she could have come around either side of the house to the front and thence into the street.

I. Instruction No. 6 given at the request of the State was as follows:

"The Court instructs the jury that before you can acquit the defendant on the ground of self-defense you ought to believe that the defendant's alleged cause of apprehension was reasonable. Whether the facts constituting such reasonable cause have been established by the evidence, you are to determine, and unless the facts constituting such reasonable cause have been established by the evidence, you cannot acquit on the ground of self-defense, even though you may believe that the defendant actually thought she was in danger. But on the other hand, the law does not permit a person to voluntarily seek or invite a combat, or to put herself in the way of being assaulted in order that when hard pressed she may have a pretext to take the life of her assailant or to do him some great bodily harm. The right of self-defense does not imply the right of attack, and it will not avail in any case where the difficulty is sought for and induced by the party by any willful act of hers, or where she voluntarily and of her own free will enters into it, no matter how imminent her peril may become during the progress of the affray. The necessity being of her own creation will not operate to excuse her. Nor is anyone justified in using any more force than is apparently necessary to get rid of her assailant. But if she does not bring on the difficulty nor provoke it, or voluntarily engage in it, she is not bound to flee to avoid it, but may resist with adequate and necessary force until she is safe.

"Now if you believe from the evidence in this case that the defendant voluntarily sought, invited or brought on the difficulty in which William Jones was shot, if so, or that she provoked or commenced or brought it on by any willful act of her own, then in that case you are not authorized to acquit the defendant upon the ground of self-defense, and this is true no matter howsoever hard she was pressed, or how imminent the peril became during the progress of the affray. In determining who provoked or commenced the difficulty or made the first assault, you should take into consideration all the facts and circumstances in evidence before you."

(a) Appellant first assigns error in the giving of this instruc-

tion, contending there was no evidence to support the hypothesis submitted in the second paragraph thereof, that she voluntarily sought, invited or brought on the difficulty in which the deceased Jones was shot, or that she commenced or brought it on by any willful act of her own. In provoking a difficulty, it is said in 30 Corpus Juris, section 212, page 48, the acts of provocation "must have been committed at the time the homicide occurred, and must have related to the assault in the resistance of which the assailant was killed." On the other hand, the rule as stated in 13 Ruling Case Law, section 136, page 832, is that "the fault in bringing on a difficulty which will deprive one of the right of self-defense is not ·confined to the precise time of the fatal encounter which results, but may include fault so closely connected with the difficulty in time and circumstances as to be fairly regarded as operating to bring it on."

Even if it be conceded the appellant sought or brought on the quarrel at the dance and the quarreling and fighting on the way home, we think their connection with the combat and shooting was too remote to make them a part of "the difficulty" within the meaning of the law and the above instruction. Hostilities had ceased, but it appears that after the appellant and Jones reached her home they renewed their quarrel. He told her he was going to kill her but he made no move to do it; he was sitting in a chair fixing his wounded foot. She told him he might if she "did not beat him to it." She went to the bedroom, got a revolver, returned to the front room and passed the deceased on her way to the door as he sat in the chair engaged with his foot. The evidence does not show whether she had the weapon concealed. At the trial she testified he then jumped at her and she shot him in self-defense. We think, however, the evidence favorable to the State warranted an inference that she was not on the defensive, and that she came in provoking proximity to him when he was not on the aggressive, intending to shoot him. At least there is ground for the conclusion that she armed herself and voluntarily entered into the difficulty without being driven to that extremity and self-defense. And it has been held that when two persons engage in mutual combat in such circumstances the law will regard both as the aggressors. [State v. Spears, 46 La. Ann. 1524, 1526; See 45 L. R. A., p. 704, note.] We therefore rule this assignment against the appellant.

■ (b) The next assignment contends the instruction was erroneous because it told the jury: "Nor is anyone justified in using any more force than is apparently necessary to get rid of her assailant." On this point appellant cites State v. Hopkins, 278 Mo. 388, 394, 213 S. W. 126, 128; State v. Roberts, 280 Mo. 669, 682, 217 S. W. 988, 992; State v. Creed, 299 Mo. 307, 318, 252 'S. W. 678, 681; State v. Ball (Mo. Div. 2), 262 S. W. 1043, 1045.

In the Hopkins case this Division condemned the following lan-

guage in an instruction: "No one is justified in using more force than is necessary to get rid of an assailant." Commenting thereon the opinion says: "It is well settled that a person is not required to nicely gauge the amount of force necessary to repeal an attack, but that he may act on appearances." In the Roberts case the court en banc said: "We desire to say that the sentence, 'nor is anyone justified in using any more force *than is necessary* to get rid of his assailant,' has no proper place in an instruction on self-defense." The opinion italicized the words than is necessary, showing, in connection with the Hopkins case, the objection to the instruction was that it held the 'defendant to an absolute standard of the amount of force necessary to repel the assault instead of the amount *apparently* necessary. The Creed case followed the Hopkins and Roberts cases. The Ball case held bad an instruction which added the word reasonably, thus: "No one is justified in using any more force than is reasonably necessary to get rid of an assailant or to repel an assault made upon him."

But these cases do not help appellant. The instruction in the instant case used the word apparently, saying, "No more force than is apparently necessary." Furthermore, the court gave an instruction lettered I for the appellant telling the jury "nor was the defendant required to nicely measure the proper quantity of force necessary to repel the assault, but that she could use any means for her own protection that appeared reasonably necessary under the circumstances." For these reasons we hold the instruction is not open to the attack made by appellant under this assignment.

█ (c) It is next assigned by appellant that the instruction is prejudicially erroneous because of the unqualified statement therein that "the right of self-defense does not imply the right of attack." We think appellant's contention is correct. An instruction containing the language, and the same whole sentence as that in which the quoted language appears in the instruction in this case, was condemned in State v. Rennison, 306 Mo. 473, 483, 267 S. W. 850, 852, where it was said: "This instruction unreasonably restricts the right of self-defense. The right to defend against an assault may imply the right of attack." [See, also, State v. Creed, 299 Mo. 1. c. 318, 252 S. W. 1. c. 681 (4); State v. Ball, 262 S. W. 1. c. 1045; State v. O'Leary (Mo. Div. 2), 44 S. W. (2d) 50, 54 (4).] In the instant case according to the appellant's testimony, the deceased threatened to kill her. She got a revolver and after getting past him as he sat in a chair, she tried to open the door and go outside. He said, "I am going to finish you now" and jumped toward her. Then she shot him to save herself. If the jury believed her story and further believed she was acting only in self-defense, she was entitled to acquittal on that ground even though she shot the deceased before he had reached her. In those circumstances, the right of attack was essential to her right of self-defense.

(d) Appellant's fourth assignment complains of the charge in the instruction that the right of self-defense will not avail in any case where the defendant voluntarily and of her own free will enters into the difficulty. Several times instructions containing the same or similar language have been condemned by this court. [State v. Burns, 278 Mo. 441, 447, 213 S. W. 114, 116; State v. Hopkins, 278 Mo. 388, 393, 213 S. W. 126, 128; State v. Canton (Mo. Div. 2), 222 S. W. 448, 449; State v. Creed, 299 Mo. 1. c. 318, 252 S. W. 1. c. 681; State v. Moore (Mo. Div. 2), 29 S. W. (2d) 148, 150; State v. Dollarhide, 333 Mo. 1087, 1090, 63 S. W. (2d) 998, 999.] The reason given is that expressions so broad and unqualified include even voluntary acts of the defendant done in self-defense. It is said, in other words, that if a defendant is attacked without provocation on his part and voluntarily defends himself he voluntarily engages in the fight, and yet by such an instruction he is denied his legal right of self-defense.

(e) Appellant makes still another assault upon the part of the instruction which says the right of self-defense will not avail in any case where the difficulty is sought for and induced by the party by any willful act of hers, or where she voluntarily and of her own free will enters into it; also upon the charge in the second paragraph thereof that if the jury believed the appellant voluntarily sought, invited or brought on the difficulty in which William Jones was shot, or that she provoked or commenced or brought it on by any willful act of her own, they could not acquit her on the ground of self-defense no matter however hard she was pressed, or how imminent her peril became during the progress of the affray.

Appellant contends these parts of the instruction disregard the intent with which she entered the difficulty; and failed to inform the jury that she could only be convicted of manslaughter if she brought on the difficulty without felonious intent, and with a purpose only to commit a common assault or misdemeanor. In other words, the complaint is that the instruction deprived appellant of the right of imperfect self-defense to which she was entitled under State v. Partlow, 90 Mo. 608, 4 S. W. 14, 59 Am. Rep. 31, and many subsequent decisions. We think it unnecessary to go into this question because there was no evidence in the case calling for an instruction on imperfect self-defense. In State v. Painter, 329 Mo. 314, 325, 44 S. W. (2d) 79, 83, COOLEY, C., pithily remarked, "Fist fights are not conducted with knives." The same is true of pistols.

Appellant also argues that the instruction disregarded evidence in the case tending to show she sought to abandon the difficulty and withdrew as far as she could. Both in her statement to the police and in her testimony at the trial the appellant said she got a pistol in the bedroom and walked past the deceased as he sat in a chair in the front room. She said at the trial he then jumped

at her and she shot him. In her statement to the police she said that immediately before this Jones had told her he was going to kill her and she replied that he might if she "did not beat him to it." Earlier in this opinion we held this evidence, viewed in the light most favorable to the State, made a prima facie showing that appellant provoked the difficulty. But she, also, was entitled to have the jury give consideration to those aspects of the evidence most favorable to her. At the trial she swore she was endeavoring to open the door and go outside when Jones forbade her to leave, jumped at her, and she shot him in self-defense. Even though she provoked the difficulty with felonious intent, still if she thereafter in good faith attempted to withdraw and that fact was apparent to the deceased, she did not lose her right of self-defense. [State v. Heath, 237 Mo. 255, 268 et seq., 141 S. W. 26, 30.] It seems to us her testimony was sufficient to raise a question of fact for the jury on that point. And we therefore conclude the instruction was erroneous in unconditionally denying her the right of self-defense on the hypothesis stated therein, without adding a qualifying clause saying unless the jury further found she in good faith and in the reasonable belief of the deceased attempted to withdraw from the conflict, or words to that effect. [State v. Cable, 117 Mo. 380, 384, 22 S. W. 953.]

■ II. Appellant complains of the refusal of the trial court to give at her request an instruction lettered L. This instruction told the jury that in passing upon the question whether she had reasonable grounds for believing there was imminent danger that Jones was about to kill her or do her great bodily harm they should determine the matter from the standpoint of the appellant at the time she acted and her surroundings at that particular instant of time; and that they must also take into consideration any threats or assaults made by Jones against and upon her prior to the shooting; also anything done or said by Jones at the time of the shooting indicating a purpose on his part to carry such threats into execution. The case cited in support of the instruction is State v. Hollingsworth, 156 Mo. 178, 186, 56 S. W. 1087, 1089. But the part thereof relied on and quoted in appellant's brief is not in point. It was not discussing the question of the reasonableness of the defendant's apprehension of danger, but was considering what amount of force he would be justified in using in self-defense. Furthermore we think the court sufficiently instructed on the matters covered by this refused instruction in other instructions given at the request of the defendant, namely instructions E, F, H and I.

■ III. After the appellant had testified, the State was permitted to prove in rebuttal by six witnesses that her general reputa-

tion in the community for morality prior to the homicide was bad. Her counsel objected and excepted to this line of testimony, urging that her character was not open to attack since she had not put it in issue, and that for the purpose of impeaching her as a witness only her reputation for truth and veracity could be shown. The point was duly preserved in appellant's motion for new trial, and she here assigns the trial court's ruling as error, citing State v. Scott, 332 Mo. 255, 263 (6), 58 S. W. (2d) 275, 279 (8), 90 A. L. R. 860, 866, 870, note.

Ever since the decision of State v. Shields, 13 Mo. 165, in 1850, it has been the rule in Missouri that in discrediting a witness by character testimony, a party is not limited to proof of his reputation for truth and veracity, but may show his general bad repute for morality as well. In 1878, immediately following the enactment of Laws 1877, page 356, permitting the accused in a criminal case to testify in his own behalf, the same rule was applied in State v. Clinton, 67 Mo. 380, 391, 29 Am. Rep. 506, to *defendants* thus taking the stand; and a year after the deliverance of that decision the statute was changed to its present form, Section 1918, Revised Statutes 1879; Section 3692, Revised Statutes 1929, by the inclusion (among others) of an express provision that a defendant so testifying "may be contradicted and impeached as any other witness in the case." There are now more than thirty cases from this court holding a defendant in a criminal case who makes himself a witness may be impeached by proof that his general reputation for morality is bad. [See annotation, 90 A. L. R. 1. c. 872.]

The Scott case, supra, decided two years ago, in March, 1933, did not attempt to overrule this line of decisions, but the writer hereof, who was the author of that opinion, with the concurrence of the other judges of this Division, expressed the view that "the 'morality rule' is impractical, confuses the issues, and is unfair to the defendant;" and also said, "It would be much better if Missouri were fully in line with the prevailing view elsewhere and the inquiry were limited to the real issue—reputation for veracity and honesty." The morality rule has since been twice applied by this Division, in State v. DeShon, 334 Mo. 862, 868 (3), 68 S. W. (2d) 805, 809 (4), and State v. Williams, 335 Mo. 234, 71 S. W. (2d) 732, 735 (6); but both these cases cite the Scott case (with two others) as authority. In other words, in these last three decisions this court has followed the morality rule, though condemning it. The question now before us is whether it should be repudiated or accepted as settled law. If we are to adhere to it, the rule should not be weakened by continued criticism.

It is thoroughly established that the State cannot attack the character of the accused in a criminal case for the purpose of impugning him as a defendant unless he first puts his good character in issue

by introducing evidence to sustain the same; and even then the evidence pro and con must be confined to his general reputation for the particular traits involved in the offense charged. [State v. Beckner, 194 Mo. 281, 292, 91 S. W. 892, 895, 3 L. R. A. (N. S.) 535.] On the other hand, if the defendant testifies but does not put his character in issue the morality rule permits the State to prove his bad general character, that is to say, his bad reputation for morality, but only for the purpose of impeaching him as a *witness*. Yet it has for a long time been recognized—and is undeniable—that such evidence actually does prejudice the accused as a defendant. For a bad reputation for morality imports moral turpitude, and proof of the latter hurts the accused in his defense. [State v. Edmundson (Mo. banc), 218 S. W. 864, 865.]

For this reason, mainly, our decisions have followed the rule grudgingly through the years. In State v. Shroyer, 104 Mo. 441, 447, 16 S. W. 286, 287, 24 Am. St. Rep. 344, it was conceded to be in conflict with the current of authority. In State v. May, 142 Mo. 135, 150, 154, 43 S. W. 637, 641, 642, BURGESS, J., dissented from the enforcement thereof. In State v. Pollard, 174 Mo. 607, 618, 74 S. W. 969, 971, Fox, J., though applying it, incorporated a lengthy and vigorous protest in his opinion. In State v. Oliphant, 128 Mo. App. 252, 262, the late lamented Judge JOHNSON, speaking for the Kansas City Court of Appeals, said: "The great weight of authority in other jurisdictions supports the contrary rule, that impeaching evidence should be confined to the reputation of the witness for truth and veracity." And the learned judge added that he personally agreed with the individual opinion expressed by Fox, J., in State v. Pollard, supra, "that reason and logic are on the side of the latter rule." In State v. Archie, 301 Mo. 392, 407, 256 S. W. 803, 808, the morality rule was, in effect, rejected by this Division. It was there held that impeachment of a testifying defendant by proof of his general bad reputation for morality afforded the State an opportunity to assail him from ambush by getting before the jury, under the guise of attacking his credibility, proof prejudicing his defense or proof founded on traits of character really not affecting his credibility. This case ruled the State's impeaching questions should not use the broad indefinite word morality, and that the inquiry should be directed to specific traits affecting his credibility, such as his reputation for honesty and fair dealing. But, as we stated in the beginning, notwithstanding these decisions, the morality rule has nevertheless been followed in this State down to the present time.

In another respect this court has faltered in the application of the impeachment statute, Section 3692, supra, because of its unfairness to the defendant. Ever since the decision of State v. Grant, 79 Mo. 113, 133, the law in this State has been that proof of bad general reputation for any specific trait of character indicating moral de-

generation is admissible to impeach an ordinary witness. In that case evidence showing the general reputation of a witness as a common drunkard was held competent. So, also, it has been decided several times that the credibility of a witness may be attacked by proving his or her bad reputation for chastity. This rule was reluctantly applied by Fox, J., in State v. Pollard, 174 Mo. 1. c. 607, 74 S. W. 1. c. 971, to the defendant in that case, who had testified as a witness, although the crime for which he was on trial was defiling a female ward. And in State v. Beckner, 194 Mo. 1. c. 294, 91 S. W. 1. c. 896, 3 L. R. A. (N. S.) 535, where a testifying defendant was charged with murder, and the State impeached him by proving he bore a bad reputation as a violent, turbulent and dangerous man, it was ruled the admission of this evidence was erroneous because it did not tend to affect his credibility. The necessary inference to be drawn from the case is that if the testimony had been regarded as affecting the credibility of the accused as a witness it would have been competent although it also affected him as a defendant.

But beginning with State v. Wellman, 253 Mo. 302, 314, 161 S. W. 795, 798, this court began to hold that a defendant could not be impeached as a witness by proof of his bad reputation for traits of character involved in the crime with which he stood charged. There are several cases of this sort: State v. Baird, 288 Mo. 62, 67, 231 S. W. 625, 627, 15 A. L. R. 1035; State v. Ross, 306 Mo. 499, 506, 267 S. W. 853, 854; State v. Bugg, 316 Mo. 581, 584, 292 S. W. 44, 50; State v. Irvin, 324 Mo. 217, 222, 22 S. W. (2d) 772, 774. In the Bugg case where the charge was robbery and the Irvin case, where it was larceny, the opinions went so far as to hold the defendants could not be impeached even by proof of bad reputation for *honesty and fair dealing*, because those traits were involved in the crimes charged. (Compare these holdings with State v. Archie, supra.) But these decisions are not sound, for at least two good reasons. First, if it be true that a testifying defendant cannot be impeached by proof of bad reputation for any trait of character involved in the crime charged, then in a case where the charge is perjury, slander or any crime involving his truthfulness, he could not be discredited even by evidence of bad reputation for truth and veracity—which trait always is the fundamental object of inquiry in impeaching testimony. And, second, they are in direct conflict with the statute, Section 3692, supra, which says that a testifying defendant "may be contradicted and impeached as any other witness in the case." The whole line of thirty-odd decisions in this State holding that a defendant may be impeached the same as any other witness (and therefore by proof of bad general reputation for morality) is founded on State v. Clinton, 67 Mo. 1. c. 391, 29 Am. Rep. 506, decided in 1878, and on the statute amended the following year to conform to that decision.

From this it follows that we cannot exclude the defendant from the operation of the morality rule and make it apply only to ordinary witnesses, as is done in some states: People v. Hinksman, 192 N. Y. 421, 429, 85 N. E. 676, 678; State v. Pickel, 116 Wash. 600, 607, 200 Pac. 316, 318 (6), 204 Pac. 184; Worley v. State, 32 Okl. Crim. Rep. 1, 3, 239 Pac. 683. If an ordinary witness can be thus impeached, so, by force of our statute, can a defendant who makes himself a witness, even though it prejudices him in his defense. [State v. Edmundson (Mo. banc), 218 S. W. 1. c. 864.] If a defendant who testifies is to be saved from the prejudicial effect of that rule it can be done only by changing the rule as to all witnesses, and holding that such impeaching testimony must be limited to the question really at issue, namely, the reputation of the witness for truth and veracity. In the Scott case, 332 Mo. 1. c. 266, 58 S. W. (2d) 1. c. 280, 90 A. L. R. 869, the writer expressed the opinion that the reputation of the witness for honesty also might be shown, on the theory that honesty is simply trustworthiness in both word and deed. And it is a fact that one cannot have a good reputation for honesty if he stands in bad repute for truth and veracity; but there are cases indicating a view that a man may bear a bad reputation for honesty, although not considered untruthful, as where he fails to pay his debts, or is a sharp trader, and the like. [70 C. J., sec. 1069, p. 858.] And so, to avoid ambiguity and injustice to the defendant as far as possible, it seems better that the impeaching testimony should be confined to the real and ultimate object of the inquiry, which is the reputation of the witness for truth and veracity.

This view has the approval of commentators. [2 Wigmore on Evidence (2 Ed.), sec. 922, p. 301; Jones on Evidence (3 Ed.), secs. 860, 861, pp. 1356, 1360; Greenleaf on Evidence (16 Ed.), sec. 461a, p. 576.] And such is the rule followed in the great majority of jurisdictions in the United States. As gathered from 70 Corpus Juris, sec. 1039, page 826, 2 Wigmore on Evidence (2 Ed.), section 923, page 304 et seq., and the 1934 Supplement thereto, page 378, and some brief, hurried research of our own, it appears that in nine states[1] the rule is fixed by statutes permitting evidence as to the general moral character of the witness for the purpose of impeachment. In three states[2] the statute limits the inquiry to the reputation of the witness for truth, honesty and integrity. Where there is no controlling statute it seems that in only seven states[3] may the inquiry extend to the general reputation of the witness for

---

[1] Arkansas, Georgia, Indiana, Iowa, Kentucky, Louisiana, Montana, New Mexico, Oregon.

[2] California, Idaho, Utah.

[3] Alabama, Missouri, New York, North Carolina, Oklahoma, Tennessee, Washington.

morality; and in three of these[4] the defendant is excluded from the operation of the rule. Also in some of these seven states, which follow the English practice, the proof of the bad general repute of the witness is connected up by a question to the impeaching witness whether in view of it he would believe the impeached witness under oath—thus proving the *personal opinion* of the impeaching witness as to the veracity of the impeached witness. This practice was once considered essential in Missouri but has long since been discarded. [State v. Pollard, 174 Mo. l. c. 621, 74 S. W. l. c. 973.] In twenty-two states[5] the impeachment evidence is confined to the reputation of the witness for truth and veracity.

Aside from the weight of authority in other jurisdictions, reason favors the truth and veracity rule rather than the morality rule. The arguments for the latter are: (1) that bad general character, or moral degeneration, begets untruthfulness; (2) that it is often more obvious and easier to prove than is a lack of veracity; (3) and that since the bad character of a witness may be directly proven for the purpose of impeachment by evidence of former convictions of criminal offenses (see Sec. 1752, R. S. 1929) or by admissions of fact evidencing moral turpitude elicited from the witness upon cross-examination there is no reason why he should not be impeached by proof of his bad general reputation for morality.

The arguments supporting the truth and veracity rule are: (1) that it reaches directly the fundamental object of the inquiry; (2) that a general bad reputation for morality does not always necessarily import a lack of veracity; (3) that the conclusions of an ordinary impeaching witness on such a question are apt to be drawn inexactly from uncertain data, or to rest on personal prejudice or honest differences of opinion on points of belief or conduct; (4) that impeachment by methods so loose and inconclusive often exposes witnesses to undeserved obloquy and introduces collateral issues; (5) and that while witnesses may be directly discredited by proof of former convictions, or admissions of fact involving moral turpitude, still they ought not to be subjected to impeachment by indefinite hearsay, i. e., by proof of bad repute for morality. [2 Wigmore on Evidence (2 Ed.), sec. 922, p. 302; People v. Hinksman, 192 N. Y. l. c. 432, 85 N. E. l. c. 680.]

We think the latter arguments are the stronger. As we said in State v. Scott, 332 Mo. l. c. 264, 58 S. W. (2d) l. c. 279, 90 A. L. R. l. c. 867: ''It may be true that a person whose general moral character is bad will be less likely to tell the truth than one whose char-

---

[4] New York, Oklahoma, Washington. See cases, supra.

[5] Colorado, Connecticut, Florida, Illinois, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Hampshire, New Jersey, Ohio, Pennsylvania, Rhode Island, South Carolina, Texas, Virginia, Vermont, West Virginia.

acter is good, but since there is such a relation between character and credibility, if the witness's reputation for general morality be bad, why should not his reputation for veracity ordinarily be the same; and why should the impeaching witnesses not be asked that ultimate question? On the other hand, if in spite of a bad reputation for general character, qualified impeaching witnesses are unable to say the (reputed) veracity of the person under investigation is bad, why should an uninformed jury be permitted to draw that conclusion?" We therefore hold that State v. Clinton, supra, State v. Scott, supra, and all the cases herein mentioned following the morality rule should no longer be followed—from which it results that the trial court committed error in admitting testimony of the appellant's bad general reputation for morality to impeach her as a witness. In the 1934 Supplement to his treatise on Evidence, section 924a, page 379, et seq., Professor WIGMORE maintains that for psychosexual reasons an exception to the general rule should be allowed in prosecutions of men charged with sexual crimes against women, and that in such cases proof of the general bad repute of the prosecutrix for chastity should be admitted in evidence to impeach her as a witness. Obviously, a consideration of this question does not come within the scope of this opinion.

IV. Counsel for appellant sought to prove by the witnesses Dr. O. A. Moore and Dr. Hugh P. Muir, physicians who examined the appellant after the homicide, that in their professional opinion her condition resulting from her injuries and nervousness, as they found and described it, was such as to affect materially the statements she made to the police shortly after the killing, and that she was not entirely capable of making a clear and concise statement of the facts at that time. The trial court sustained the prosecuting attorney's objections to the questions and counsel for appellant thereupon dictated into the record an offer of poof embodying the foregoing facts. The court excluded the proffered testimony on account of the form of the offer, and because the conclusions sought to be shown invaded the province of the jury and covered matters which were not the proper subject of expert testimony. These rulings are assigned as error on this appeal.

The general proposition is well settled that expert testimony by a competent physician or surgeon is admissible to show the effect commonly produced by injuries of a designated character upon the body and mind of a human being. [22 C. J., sec. 640, p. 544.] But in this instance when the appellant's statements to the police were proven by the State no objection was made by appellant's counsel to their admission in evidence. Furthermore the only offer of proof made was that her injuries and nervousness had or might have had a material effect on her statement and that she was not *entirely* capable of making *a clear and concise statement*. It was not con-

tended that she could not make a true statement of the facts. We think the court did not err in rejecting the proof, as offered.

V. The foregoing disposes of all assignments of error in appellant's brief except one charging improper argument by the prosecuting attorney. As the case must be remanded for other reasons we need not consider this assignment. There are several assignments in appellant's motion for new trial which were abandoned in her briefs on appeal. We find nothing in them meriting discussion. Because of the errors pointed out in the State's Instruction No. 6, and the erroneous admission of testimony concerning the appellant's reputation for morality, the judgment is reversed and the cause remanded. Division Two opinion is hereby adopted as the opinion of the Court en Banc. All the judges concur.